IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| MICHAEL W. ROGERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case. No. 19-CV-3145-JTM-ADM |
| | ) | |
| SAM CLINE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

In his 42 U.S.C. § 1983 complaint, Michael Rogers, an inmate of the Kansas Department of Corrections (KDOC), alleges that prison officials violated his Eighth Amendment right to be free from cruel and unusual punishment by failing to protect him from an assault at the hands of other inmates on July 19, 2019 at El Dorado Correctional Facility (EDCF). Doc. 1. Rogers alleges that when the administration closed the Managed Movement Unit at EDCF on June 25, 2019, he was forced into general population without being required to sign a waiver of protective custody. Doc. 1 at 1-3. This, he asserts, caused him to be assaulted on July 19, 2019 by members of the same hate group as assailants that assaulted him at EDCF in July of 2017. Doc. 1 at 5.

Rogers sues EDCF Warden Sam Cline, Unit Team Manager (UTM) Richard English, and Special Agent Brett Sissell, in both their individual and official capacities. Doc. 1 at 1-3. For relief, he seeks compensatory and punitive damages. Doc. 1 at 14. Rogers is no longer housed at EDCF, *see* Doc. 19 & 23-1, and does not request any injunctive relief. Doc. 1.

The Court dismissed on screening Rogers' procedural due process claims, leaving only his Eighth Amendment claims. Doc. 28.

1

Defendants move for dismissal or, alternatively, summary judgment on Rogers' Eighth Amendment claims against them based on Eleventh Amendment immunity and qualified immunity. First, the Eleventh Amendment bars damages claims against defendants in their official capacity. They must be dismissed for lack of subject matter jurisdiction. Second, Defendants are entitled qualified immunity because Rogers cannot establish that they violated his Eighth Amendment rights, let alone that they acted unreasonably in light of clearly established law.

**Statement of Facts**

1. Plaintiff Michael Rogers has been in the custody of the KDOC since 2017. Doc. 23-1 at 3.
2. Rogers was housed at EDCF from July 19, 2017 to August 22, 2017 and February 6, 2018 to February 4, 2020. Doc. 23-1 at 2-3.

*Managed Movement Unit*

3. In April of 2018, EDCF Cellhouse E-1 was converted to the Managed Movement Unit, an experimental housing unit for inmates who qualified for protective custody but would receive additional privileges like that of the general population. Doc. 23-3 ¶¶ 2-4; 23-4 ¶¶ 2-4.
4. Rogers lived in this experimental unit at various times in 2018 and 2019. Doc. 23-4 ¶ 5; 23-8 ¶ 14-18.
5. On May 9, 2018, Rogers signed an Acknowledgement & Release Protective Custody Form to become a part of the Managed Movement Unit. Doc. 23-5 at 2; 23-8 ¶ 14; 23-4 ¶ 6.
6. On April 19, 2019, Rogers signed another protective custody wavier when suspicious behavior was observed between him and his cellmate. Doc. 23-5 at 1; 23-8 ¶ 18; 23-4 ¶ 6.
7. On June 25, 2019, the Unit was disbanded and Cellhouse E-1 returned to being a regular general population housing unit. Doc. 23-3 ¶ 5; 23-4 ¶ 7.

*Rogers' Decision to Remain in General Population*

8. In the weeks leading up to June 25, 2019, UTM English had multiple discussions with Rogers about the Unit's upcoming return to general population. Declaration of Richard English ¶ 3, attached hereto as Exhibit A (hereinafter, "English Decl."); 23-4 ¶ 9.

9. On or around June 5, 2019, Rogers sent an inmate request form to UTM English asking about being transferred to a lower-security facility due to his "Florida issues with the Aryan Brotherhood." Doc. 26-1 at 23; English Decl. ¶ 4.

10. Based on his discussions with Rogers, UTM English did not perceive Rogers to be expressing any present fear for his safety while he was in the Managed Movement Unit. English Decl. ¶ 5.

11. In later conversations with UTM English, Rogers conveyed to him that he was ready to be in general population and felt comfortable choosing to enter it because he had gotten word from inmates across the hall in E-2 Cellhouse that he would not face any issues in general population. English Decl. ¶ 6.

12. Rogers advised UTM English that the people he was worried about in the past were now in segregation or had been transferred. English Decl. ¶ 7.

13. Rogers advised UTM English that he did not fear for his safety entering general population. English Decl. ¶ 8.

14. UTM English was not aware of any reason Rogers should not enter general population. English Decl. ¶ 8.

15. Rogers decided he wanted to enter general population rather than be transferred to restrictive housing for protective custody. Doc. 23-8 ¶ 20; English Decl. ¶ 9; 23-4 ¶ 9.

16. Rogers could have chosen to request transfer to protective custody instead of return to general population. Doc. 23-8 ¶ 19; English Decl. ¶ 10; 23-4 ¶ 8.

17. Many inmates in the Managed Movement Unit did ask to be placed in protective custody rather than return to general population, and UTM English promptly initiated their transfer to a restrictive housing unit. English Decl. ¶ 11.

18. In Rogers' many discussions with UTM English about the transition of the Managed Movement Unit to a general population unit, Rogers never asked to be placed in protective custody. English Decl. ¶ 12.

19. Had Rogers asked UTM English to be placed in protective custody, UTM English would have promptly initiated Rogers' transfer to a restrictive housing unit. English Decl. ¶ 13.

20. On June 21, 2019, UTM English sent an email to EDCF's Enforcement, Apprehension, and Investigations (EAI) Unit conveying that Rogers was requesting to be housed in EDCF general population since the people he was worried about were in segregation or transferred. Doc. 23-14.

21. On July 1, 2019, during a mental health visit, Rogers conveyed to his medical provider that he moved out of the PC unit, but felt he would be fine now that his gang affiliation had been clarified. Doc. 23-15 at 1.

*Assignment to D Cellhouse*

22. On July 7, 2019, Rogers was placed in segregation in A Cellhouse for pre-hearing detention. Doc. 23-8 ¶ 21; 23-10.

23. When Rogers was scheduled to be moved out of segregation, UTM English was consulted about returning Rogers to E-1 Cellhouse as part of the general population. Doc. 23-8 ¶ 22.

24. Based on his review of Rogers' file and previous observation, UTM English expressed concerns about Rogers returning to E-1 Cellhouse and recommended he be transferred to D Cellhouse instead. Doc. 23-8 ¶ 22; 23-4 ¶ 11.

25. On July 11, 2019, Rogers was placed in D Cellhouse. Doc. 23-8 ¶ 23; 23-10.

*July 19, 2019 Assault*

26. On July 19, 2019, Rogers left his assigned housing location, D Cellhouse, and travelled to E Cellhouse. Doc. 23-8 ¶ 24; 23-7.

27. Rogers did not ask permission to leave his assigned Cellhouse and did not tell any staff where he was going in violation of Cellhouse rules. Doc. 23-8 ¶ 24; 23-6 ¶ 6; 23-11 ¶¶ 5, 7-8.

28. While in E-1 Cellhouse that evening, Rogers was attacked by other inmates and stabbed multiple times. Doc 23-6 at 3-7.

29. Special Agent Brett Sissell of the EAI Unit investigated the incident and determined it was Security Threat Groups related. Doc. 23-6 ¶5.

30. On July 22, 2019, Special Agent Sissell interviewed Rogers at the hospital about the incident. Doc. 23-6 at 4; Audio Recording, Exhibit H to Martinez Report (hereinafter, "Ex. H").

31. In this interview, Rogers expressed that he had no idea where the attack came from and no one had given him any kind of indication it was coming. Ex. H, Part 1 at 4:40-43, Part 2 at 14:46-50.

32. Special Agent Sissell discussed future housing options with Rogers, explaining that he will try to put him in the best position he can. Ex. H, Part 2 at 19:40-20:30.

33. In the context of this discussion, Rogers stated that UTM English was "a good dude" and "worked with [him] a lot." Ex. H, Part 2 at 19:54-57.

34. On July 24, 2019, Special Agent Sissell submitted disciplinary reports for the inmates involved in the assault. Doc. 23-6 at 5.

35. He also presented the case to the Butler County Attorney. Doc. 23-6 at 6.

## Questions Presented

I. Are Rogers' claims against defendants in their official capacities barred by the Eleventh Amendment?

II. Are defendants entitled to qualified immunity as they did not violate the Eighth Amendment or act unreasonably in light of clearly established law?

## Argument and Authorities

*Motion to Dismiss Standard*

On a motion to dismiss under Rule 12(b)(6), a court must accept as true all well-pleaded factual allegations in the complaint and determine whether those facts, and any inferences reasonably drawn from them, legally state a claim for relief. *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). To avoid dismissal, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although "detailed factual allegations" are not required, a plaintiff must provide "more than labels and conclusions," and "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555 (internal citations omitted).

A defendant may also move to dismiss for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Kline v. Biles*, 861 F.3d 1177, 1180 (10th Cir.) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Plaintiff, as the party

invoking the Court's jurisdiction, bears the burden of showing its existence. *Id.* "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 906 F.3d 926, 931 (10th Cir. 2018) (quoting *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974)).

*Summary Judgment Standard*

Under Rule 56, summary judgment is required "if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Halley v. Huckaby*, 902 F.3d 1136, 1143 (10th Cir. 2018) (citing *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018)). A dispute is genuine if it is "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, the nonmoving party cannot create a genuine issue of fact by making allegations that are clearly unsupported by the record as a whole. *Scott v. Harris*, 550 U.S. 372, 378-81 (2007). Whether a dispute is material is determined by substantive law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (1998) (citing *Anderson*, 477 U.S. at 248). Where there is no genuine dispute of material fact regarding just one of the essential elements a plaintiff must prove, then summary judgment must issue in the defendant's favor. *See Sports Unlimited, Inc. v. Lankford Enters., Inc.*, 275 F.3d 996, 999 (10th Cir. 2002) (citing *Adler*, 144 F.3d at 671).

**I. Rogers' claims against defendants in their official capacities are barred by the Eleventh Amendment.**

Rogers' claims against defendants in their official capacities are barred by the Eleventh Amendment and should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1). *Fent v. Okla. Water Res. Bd.*, 235 F.3d 553, 559 (10th Cir. 2000). "The Eleventh Amendment bars

7

suits in federal court against a nonconsenting state brought by the state's own citizens." *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019) (citing *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974)). "This immunity extends to arms of the state and to state officials who are sued for damages in their official capacity." *Id.* (citing *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013)). As officials of the KDOC, defendants share the State's immunity for the claims against them for money damages. *See White v. Colorado*, 82 F.3d 364, 366 (10th Cir. 1996); *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1232 (10th Cir. 2004). Moreover, state officials sued in their official capacities are not "persons" amenable to suit under § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, the official-capacity claims against defendants must be dismissed.

## II. Defendants are entitled to qualified immunity as they did not violate the Eighth Amendment or act unreasonably in light of clearly established law.

Qualified immunity "shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law." *Burke v. Regalado*, 935 F.3d 960, 1001-02 (10th Cir. 2019) (quoting *Henderson v. Glanz*, 813 F.3d 938, 951 (10th Cir. 2015)). It "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 5-6 (2013) (internal citations and quotations omitted).

"A defendant's motion for summary judgment based on qualified immunity imposes on the plaintiff 'the burden of showing both (1) a violation of a constitutional right; and (2) that the constitutional right was clearly established at the time of the violation.'" *Burke*, 935 F.3d at 1002 (quoting *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 877 (10th Cir. 2014)). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law

to be as the plaintiff maintains." *Stewart v. Beach*, 710 F.3d 1322, 1331 (10th Cir. 2012) (quoting *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010)).

The court may address either prong of the qualified immunity test first. *Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). And "[i]f the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (citing *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995)).

**A. Defendants did not violate the Eighth Amendment.**

Prison officials have a duty under the Eighth Amendment to "take reasonable measures to guarantee the safety of the inmates," including "protect[ing] prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984); *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). This does not mean, though, that "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. Rather, to state a failure-to-protect claim, an inmate must show both "that he is incarcerated under conditions posing a substantial risk of serious harm" and that the prison officials had a "sufficiently culpable state of mind," i.e., "one of 'deliberate indifference' to [his] . . . safety." *Id.* (quoting *Wilson v. Sieter*, 501 U.S. 294, 302-03 (1991)).

Under the deliberate indifference standard, "a prison official may be held liable . . . only if he knows that [an] inmate[] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. Thus, "to show that a defendant prison official was deliberately indifferent, the plaintiff must show both 'that the official was subjectively aware of the risk,' and that the official 'recklessly disregard[ed] that risk.'" *Wilson v. Falk*, 877

F.3d 1204, 1209 (10th Cir. 2017) (internal citations omitted) (quoting *Farmer*, 511 U.S. at 828, 836). "Deliberate indifference requires more than a finding of negligence." *Verdecia v. Adams*, 327 F.3d 1171, 1177 (10th Cir. 2003).

For the first component, "[t]he official must actually be 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Poore v. Glanz*, 724 F. App'x 635, 639 (10th Cir. 2018) (citing *Farmer*, 511 U.S. at 837). "An official's failure to alleviate a significant risk of which he was unaware, no matter how obvious the risk or how gross his negligence in failing to perceive it, is not an infliction of punishment and therefore not a constitutional violation." *Id.* (quoting *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008)).

As to the second part, "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Farmer*, 511 U.S. at 845. Therefore, "even if a prison official has knowledge of a substantial risk of serious harm to inmates, he is not deliberately indifferent to that risk unless he is aware of and fails to take reasonable steps to alleviate that risk." *Tafoya*, 516 F.3d at 916. Accordingly, "prison officials . . . may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

**1. Defendants were not actually aware of a substantial risk of serious harm to Rogers.**

Rogers alleges that "[a]ll three defendants knew of the danger of placing the Plaintiff into general population due to past assults [sic] and Plaintiff's voiced concerns." Doc. 1 at 13. He asserts that UTM English "knew that if the Plaintiff was placed into general population [he] would be assaulted as he had been in the past" and that Special Agent Sissell "kn[ew] that there was an immediate danger to the Plaintiff due to past assults [sic] that took place at El Dorado Correctional

10

Facility." Doc. 1 at 10, 11. Rogers appears to impute knowledge to the defendants based on his July 2017 attack at EDCF by alleged members of a white supremacist hate group and later placement in protective custody in 2018 out of fear for his safety. Doc. 1 at 4-5.

The fact that Rogers was previously assaulted and in protective custody does not suffice to show that Warden Cline, UTM English, or Special Agent Sissell were subjectively aware of a current serious threat to Rogers' safety in EDCF general population in June 2019. Even if Rogers' "voiced concerns" about his past safety issues, it does not follow defendants would infer he was facing a present substantial risk of harm based on them. "[G]eneralized, vague, or stale concern[s] about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger." *Requena v. Newkirk*, No. 13-3043-SAC, 2020 WL 1303964, at *7 (D. Kan. Mar. 19, 2020) (quoting *Gevas v. McLaughlin*, 798 F.3d 475, 480-81 (7th Cir. 2015)). Nor does Rogers' request to UTM English asking about a transfer to a lower-security facility because of "the Florida issues with the Aryan Brotherhood," Doc. 26-1 at 23, support an inference of knowledge of a serious risk of harm. "Requesting a transfer because something might happen to him is vague, lacks detail, and does not communicate any justified fear of imminent physical attack from other inmates." *Requena*, 2020 WL 1303964, at *9.

With the benefit of hindsight, Rogers suggests defendants should have perceived a threat to him from his assailants—even though he himself did not anticipate any attack and was unaware of a risk of serious harm. *See* Ex. H, Part 1 at 4:40-43, Part 2 at 14:46-50. Rogers apparently thought he was safe enough in general population to venture into a different Cellhouse without permission from staff. Doc. 23-8 ¶ 24; 23-6 ¶ 6. He believed, and shared with staff, that he was safe now that his gang affiliation had been clarified. Doc. 23-15 at 1; English Decl. ¶¶ 6-8. Defendants should not be expected to have perceived a threat that Rogers himself did not. *See*

*Fields v. Huffman*, No. 07-3310-JTM, at 13 (D. Kan. Aug. 20, 2010) (citing *Lane v. Klinger*, No. 01-6144, 25 F. App'x 781, 783, 2001 WL 1580988, at *1 (10th Cir. 2001)). "The mere fact that an assault occurred does not establish the requisite deliberate indifference to Plaintiff's constitutional rights." *Dumas v. Easter*, No. 19-3247-SAC, 2020 WL 4530473, at *2 (D. Kan. Aug. 6, 2020) (citing *Hovator v. Robinson*, 1 F.3d 1063, 1068 (10th Cir. 1993)).

Rogers cannot carry his burden to establish an Eighth Amendment violation because he cannot show that any of the defendants were aware of a substantial risk to his safety. "An official's failure to alleviate a significant risk of which he was unaware, no matter how obvious the risk or how gross his negligence in failing to perceive it, is not an infliction of punishment and therefore not a constitutional violation." *Poore*, 724 F. App'x at 639 (quoting *Tafoya*, 516 F.3d at 916).

**2. UTM English and Special Agent Sissell acted reasonably to ensure Rogers' safety.**

Additionally, Rogers cannot show that defendants failed to take reasonable measures to alleviate any risk of harm to his safety. By Rogers' own submissions, UTM English acknowledged his concerns about where he would be housed after the Managed Movement Unit ended, Doc. 26-1 at 23, and "worked with him a lot." Ex. H, Part 2 at 19:54-57. Rogers contends that "Defendant English has had Plaintiff in his office numerous times to speak with him about these problems as well as contacting Defendant Sissell." Doc. 26 at 17. An email sent by UTM English to EDCF's EAI Unit corroborates that he reached out to the EAI Unit about Rogers' request to be housed in EDCF general population. Doc. 23-14. These reasonable steps taken by UTM English in response to Rogers' concerns preclude a finding of deliberate indifference.

Likewise, Special Agent Sissell took reasonable measures to ensure Rogers' safety. After the attack, he thoroughly investigated the incident, collecting information from Rogers and other witnesses to better understand the circumstances of the attack and the risk of danger Rogers' faced

going forward, and discussed with Rogers what housing options would be best for him. *See generally* Doc. 23-6; Ex. H. Special Agent Sissell submitted disciplinary reports for the inmates who attacked Rogers and also presented the case to the Butler County Attorney. Doc. 23-6 at 5-6. Rogers appears to fault Special Agent Sissell for suggesting but not holding a meeting with him before he joined the regular general population. Doc. 1 at 3, 11. If anything, the failure to hold a meeting amounts to negligence, and "[n]egligent failure to protect inmates from assaults by other inmates is not actionable under the Eighth Amendment." *Rider v. Werholtz*, 548 F. Supp. 2d 1188, 1195 (D. Kan. 2008) (quoting *Farmer*, 511 U.S. at 835).

### 3. Warden Cline's only action in this case does not support a claim.

"To be held liable under § 1983, a supervisor must have personally participated in the complained-of constitutional deprivation." *Dumas*, 2020 WL 4530473, at *3. Rogers' specific factual allegations against Warden Cline are limited to his decision to close the Managed Movement Unit. Doc. 1 at 1-2. The warden's decision to end an experimental housing program at EDCF is "entitled to great deference," as it pertains to "the internal operation and administration of the facility." *See Dumas*, 2020 WL 4530473, at *3 (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)). Rogers "does not have a constitutional right to dictate where he or other inmates are housed." *Id.* (citing *Schell v. Evans*, 550 F. App'x 553, 557 (10th Cir. 2013)). Rogers does not allege, and cannot show, any act or omission by Warden Cline that constitutes deliberate indifference.

## B. Defendants' conduct was not unreasonable in light of clearly established law.

The second part of Rogers' "heavy two-part burden" to overcome defendants' assertion of qualified immunity is to show that they violated clearly established law. *Perry v. Durborow*, 892 F.3d 1116, 1120 (10th Cir. 2018). As the Supreme Court recently found "necessary to reiterate," "'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*,

137 S. Ct. 548, 552 (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 742 (2011)). Rather, "the clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). While "'general statements of the law are not inherently incapable of giving fair and clear warning' to officers . . . 'in the light of pre-existing law the unlawfulness must be apparent.'" *Id.* (internal citations omitted) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997); *Anderson*, 483 U.S. at 640).

This is not a case where the general contours of the Eighth Amendment deliberate indifference standard for failure-to-protect claims would give defendants notice that their conduct was unlawful. The particularized facts of this case are that Rogers voluntarily chose not to be transferred to protective custody and elected to be housed in general population, despite past issues he had experienced in general population, because he believed he had clarified his gang affiliation and no longer was at risk of harm. Doc. 23-15 at 1; 23-4 ¶ 9; English Decl. ¶ 9. Rogers informed staff that the people he worried about in the past were now in segregation or had been transferred and he was told by general population inmates he would not face any issues there. English Decl. ¶¶ 6-7. Defendants had no independent knowledge of a present threat to Rogers' safety, and it was reasonable to allow him to try to re-enter general population if he wanted to and felt safe doing so. *See Ross v. Addison*, 645 F. App'x 818, 821 (10th Cir. 2016) ("prison officials could not have been consciously aware of a substantial risk" where inmate "felt sufficiently safe" to postpone his requested move.) Rogers cannot point to a Supreme Court or Tenth Circuit case, or the weight of authority from other courts, to suggest that defendants were deliberately indifferent for failing to force Rogers into protective custody against his will based on stale concerns when they were aware of no serious threat to his safety at the time.

14

To the extent Rogers suggests that the closure of the Managed Movement Unit violated the Eighth Amendment or caused him to be attacked in general population, this attenuated theory of liability is not clearly established law. When the Unit was closed, Rogers was free to seek transfer to protective custody in restrictive housing or remain in general population. Doc. 23-8 ¶ 19; English Decl. ¶ 10; 23-4 ¶ 8. While he may have preferred the unique perks of the Managed Movement Unit—a more secure setting than general population, but with several privileges unavailable to inmates in protective custody—he had no right to its continued existence. "A prisoner is entitled to adequate protection from harm, but is not entitled to direct prison officials on the means to accomplish it." *Rider*, 548 F. Supp. 2d at 1199 (quoting *Hall v. Arnold*, 2007 WL 3399745, *4 (E.D. Ky. 2007)).

It was Rogers' own informed decisions that led to his being at risk of harm when he was attacked. Not only did Rogers choose to be in general population rather than restrictive housing, Rogers chose to leave his assigned Cellhouse without permission and wander to another building where he was ultimately attacked. Doc. 23-8 ¶ 24; 23-7; 23-6 ¶ 6; 23-11 ¶¶ 5, 7-8. Defendants did not violate clearly established law, as multiple courts have found inmates' similar actions undermine a finding of deliberate indifference. *See, e.g.*, *Dickey v. Merrick*, 190 F. App'x 692, 694 (10th Cir. 2006) (no deliberate indifference shown when inmate "made an informed decision to risk his own safety by choosing to go to the recreation yard" where a specific class of inmates were present and was subsequently attacked); *Faulkner v. Litscher*, 130 F. App'x 812, 813 (7th Cir. 2005) (no deliberate indifference when inmate who was threatened by gang members expressed desire to remain in the general population and declined the option of transferring to segregation; "The fact that [the inmate] might have made a bad choice because the threatened violence was ultimately not averted does not make for a constitutional violation."); *Benner v. McAdory*, 165 F.

15

Supp. 2d 773, 779 (N.D. Ill. 2001), *aff'd*, 34 F. App'x 483 (7th Cir. 2002) (no Eighth Amendment claim against prison official when inmate's own decision to leave sick call and the dayroom without an escort and approach the cell of another inmate was the proximate cause of his injury.)

Because Rogers cannot show an Eighth Amendment violation by any defendant, let alone a clearly established one, each is entitled to qualified immunity.

**Conclusion**

This case should be dismissed or, alternatively, summary judgment should be granted in defendants' favor based on Eleventh Amendment immunity and qualified immunity. Defendants thus ask the Court to grant this motion.

Respectfully submitted,

OFFICE OF THE ATTORNEY GENERAL
DEREK SCHMIDT

s/ Kathleen M. Barceleau
Kathleen M. Barceleau, KS No. 28401
Assistant Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas, 66612-1597
Phone: (785) 296-2215
Fax: (785) 291-3767
Email: kathleen.barceleau@ag.ks.gov
*Attorney for Defendants Sam Cline, Brett Sissell, and Richard English*

**EXHIBIT**

Exhibit A          Declaration of Richard English

**CERTIFICATE OF SERVICE**

     I certify that August 14, 2020 the foregoing was electronically filed with the clerk of the court using the CM/ECF system and a copy was mailed first-class, postage prepaid to:

Plaintiff pro se         Michael W. Rogers, #115224
                           Larned Correctional Mental Health Facility
                           1318 KS Highway 264
                           Larned, KS 67550

                                                     s/ Kathleen M. Barceleau
                                                     Kathleen M. Barceleau
                                                     Assistant Attorney General