IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MICHAEL W. ROGERS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case. No. 19-CV-3145-JAR-ADM |
| SAM CLINE, *et al.*, | ) ) ) |
| Defendants. | ) ) ) |

**MOTION TO RECONSIDER
WITH MEMORANDUM IN SUPPORT INCORPORATED**

On April 27, 2021, Judge Marten issued a Memorandum and Order denying summary judgment to defendants Warden Cline and UTM English. Doc. 47. Because they are entitled to qualified immunity and it was clear error to deny them summary judgment, Warden Cline and UTM English move under D. Kan. Rule 7.3(b) to reconsider this ruling.

**Nature of the Matter Before the Court**

This is a 42 U.S.C. § 1983 case by Michael Rogers, an inmate formerly at El Dorado Correctional Facility (EDCF). When the experimental housing unit he lived in was disbanded, Rogers chose to enter the general prison population rather than move to restrictive housing where he could be housed in protective custody. He made this decision after consideration and despite past safety concerns. Unfortunately, this decision proved unwise as he suffered an attack by other inmates in general population. He now seeks to hold the Warden and his former Unit Team Manager (UTM) personally liable for failing to protect him from general population inmates.

After the *Martinez* Report was filed, defendants filed an early dispositive motion raising the defense of qualified immunity. Judge Marten granted qualified immunity as to one of the

1

defendants but denied it as to Warden Cline and UTM English. This ruling was based on a misapprehension of the facts and the parties' positions, as well as clear errors of law. On the undisputed facts, neither the Warden nor UTM English violated clearly established law when they permitted Rogers to choose to enter the general population instead of protective custody.

## Statement of Facts

Defendants set forth a statement of facts in support of summary judgment. Doc. 35 at 2-6. Rogers responded with a "Statement of Facts with Controverted Reply to Said Facts." Doc. 42 at 4-19. Relevant here are a few of defendants' facts and Rogers' responses to them:

| | Defendants' Facts | | Rogers' Response |
|---|---|---|---|
| 15 | Rogers decided he wanted to enter general population rather than be transferred to restrictive housing for protective custody. | 30 | Rogers responds that "he has never denied not wanting to be placed in a general population setting that meets his custody instead of restrictive housing." |
| 16 | Rogers could have chosen to request transfer to protective custody instead of return to general population. | | He "does however adamantly deny ever wanting to be placed in population at EDCF or any max facility." |
| 17 | Many inmates in the Managed Movement Unit did ask to be placed in protective custody rather than return to general population, and UTM English promptly initiated their transfer to a restrictive housing unit. | 32 | "The plaintiff does not deny this statement." |
| 18 | In Rogers' many discussions with UTM English about the transition of the Managed Movement Unit to a general population unit, Rogers never asked to be placed in protective custody. | 33 | "The plaintiff should not have to verbally tell the defendant English he wanted to be placed in protective custody . . . ." |
| 19 | Had Rogers asked UTM English to be placed in protective custody, English would have promptly initiated Rogers' transfer to a restrictive housing unit. | | No response. |

2

In their reply, defendants argued that their facts should be deemed admitted for summary judgment purposes under D. Kan. Rule 56.1(a) if not specifically and properly controverted by Rogers. Doc. 44 at 1. Judge Marten declined to find defendants' facts admitted, "noting plaintiff's pro se status and a preference for resolving matters on their merits." Doc. 47 at 16 n.6. Defendants' reply specifically pointed out the lack of dispute over DSOF 15-19, Doc. 44 at 3-4, noting:

- While Rogers purports to "adamantly deny ever wanting to be placed in population at EDCF," he does not dispute that he chose this over transfer to restrictive housing.

- Rogers does not controvert that he could have chosen to request transfer to protective custody instead of return to general population. His "reiteration" in PSOF 30 that he would have preferred to be housed in general population at a different facility does not address the fact stated.

- Rogers admits that many inmates in the Managed Movement Unit did ask to be placed in protective custody rather than return to general population, and UTM English promptly initiated their transfer to a restrictive housing unit.

- Rogers' argument that "[he] should not have to verbally tell the defendant English he wanted to be placed in protective custody" is an admission that he did not ask English to be placed in protective custody.

- Rogers does not specifically controvert, and so admits under D. Kan. Rule 56.1(a), that had he asked UTM English to be placed in protective custody, UTM English would have promptly initiated Rogers' transfer to a restrictive housing unit.

3

In their motion for summary judgment, defendants relied on the facts contained in the *Martinez* Report and a supplemental declaration by defendant UTM English. In the nine months since that motion was filed, more evidence has become available with respect to the facts in this case. Specifically, counsel has a medical record from the relevant time period that provides additional evidence of the facts described above.

On June 20, 2019—five days before the Managed Movement Unit disbanded—Rogers visited with a mental health provider at the request of his UTM. *See* Record of Onsite Consult, attached to Declaration of Barbara Moe, Ex. A at 3. In this visit, Rogers conveyed to Ms. Pool his "high anxiety related to the upcoming changes in the cell house." *Id.* He reported "feelings of frustration[] related to feeling coerced into being attacked, having to resort to violence, or being punished and shunned away in the hole for wanting to stay out of trouble." *Id.*

Ms. Pool notes that she discussed with Rogers "making permanent decisions based on temporary feelings and understanding consequences." *Id.* She reports that Rogers "state[d] he will make the best possible decision for his safety and his future." *Id.* This visit was five days before Rogers joined the regular general population. The day after this visit, on June 21, 2019, UTM English sent an email to EDCF's Enforcement, Apprehension, and Investigations Unit conveying that Rogers was requesting to be placed in EDCF general population and asking if there were any objections to this placement. Doc. 23-14.

Rogers spoke again with Ms. Pool again on July 1, 2019, after he had left the Managed Movement Unit, and conveyed that he "feels he will be fine now that his gang affiliation has been clarified." Doc. 23-15 at 1; Doc. 42 at 16.

**Questions Presented**

I. Did the Court misapprehend the facts and parties' positions about Rogers' decision to enter general population?

II. Did the Court improperly impute others' knowledge to Warden Cline?

III. Did the Court clearly err in its qualified immunity analysis by defining the right at issue at a high level of generality rather than accounting for the circumstances?

**Argument and Authorities**

*Motion to Reconsider Standard*

Under D. Kan. Rule 7.3, "A party may file a motion asking a judge . . . to reconsider an order or decision made by that judge." While the language refers to a decision "made by that judge," the Court has declined to read the rule so narrowly and has found it applicable when a case is transferred to a different judge. *See Soc'y of Prof'l Eng'g Emps. in Aerospace v. Boeing Co.*, No. 05-1251-JWB, 2018 WL 3495855, at *4 (D. Kan. July 20, 2018); *see also McClendon v. City of Albuquerque*, 630 F.3d 1288, 1298 (10th Cir. 2011) ("[A] district judge may revisit and reconsider not only his or her own interlocutory rulings but also those of a disqualified predecessor."). The rule permits parties seeking reconsideration of a non-dispositive order to file a motion within 14 days based on "the availability of new evidence" or "the need to correct clear error or prevent manifest injustice." D. Kan. Rule 7.3(b)(2), (3).

Under Federal Rule of Civil Procedure 54(b), "any order . . . that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment adjudicating all the claims." This rule recognizes the Court's inherent power and discretion to review and revise an interlocutory order at any time prior to entry of final judgment. *Ferluga v. Eickhoff*, 236 F.R.D. 546, 549 (D. Kan. 2006). In reconsidering an interlocutory order, "'the district court is not bound by the strict standards for altering or amending a judgment encompassed in Federal Rules of

Civil Procedure 59(e) and 60(b),' which govern a district court's reconsideration of its final judgments." *Spring Creek Expl. & Prod. Co. v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1024 (10th Cir. 2018) (quoting *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1224 n.2 (10th Cir. 2008)). Nonetheless, the Court often looks to the standard under Rule 59(e), which is "essentially identical" to that under Local Rule 7.3(b). *Ferluga*, 236 F.R.D. at 549.

In any event, "a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law." *Id.* at 549 (quoting *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)). "A court has discretion whether to grant a motion to reconsider." *In re Motor Fuel Temperature Sales Practices Litig.*, 707 F. Supp. 2d 1145, 1166 (D. Kan. 2010) (citing *Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 944 (10th Cir.1995)). For these reasons, this Court has previously revisited a prior judge's ruling on qualified immunity after the case was reassigned. *See Stewart v. Beach*, No. 08-3295-JAR-KGG, 2011 WL 6740545, at *3 (D. Kan. Dec. 22, 2011), *aff'd*, 701 F.3d 1322 (10th Cir. 2012).

**I.     There is no genuine dispute that Rogers could have entered protective custody.**

The Court appears to have misapprehended the facts and the parties' positions regarding how Rogers came to be in regular general population. As explained in the facts section above, both sides agree that a transfer to protective custody in restrictive housing was an option for inmates in the Managed Movement Unit. Rogers admits that many inmates chose that option and were transferred to protective custody by UTM English. By failing to controvert the fact, Rogers admits that had he asked UTM English to transfer him to protective custody in restrictive housing, he would have done so. His argument is that he "should not have to verbally tell the defendant English he wanted to be placed in protective custody." Doc. 42 at 15.

6

While Rogers tries to obfuscate, his position is clear. He had two choices when the Managed Movement Unit closed. He could enter the regular general population, or he could transfer to restrictive housing ("the hole") to be in protective custody. He explains that he "want[ed] to be placed in a general population setting that meets his custody instead of restrictive housing." Doc. 42 at 14. He wrote to UTM English asking to be transferred to a lower-security facility. Doc. 26-1 at 23. When that did not pan out, he chose to enter the general population rather than go to "the hole."

Rogers was apparently "frustrated" with his limited choices, as he felt like choosing protective custody amounted to "being punished and shunned away in the hole for wanting to stay out of trouble." Ex. A at 3. But he admits that had he asked UTM English to be placed in protective custody, UTM English would have promptly initiated Rogers' transfer to a restrictive housing unit.

Because the Court misapprehended this key fact—that Rogers had a reasonable alternative to general population, but did not take advantage of it—its analysis is misguided. The Court mistook Rogers' insistence that he did not want to be in general population at EDCF to suggest that he had no alternative. But Rogers admits that he could have asked to go to restrictive housing, as many of his fellow inmates did. He admits that UTM English would have promptly transferred him to restrictive housing where he could have been in protective custody, away from the general population inmates. While he wants to hold the Warden and UTM English liable for the unfortunate consequences of his decision to enter the general population, he was given a reasonable alternative for his safety and chose against it.

Based on this misapprehension, the Court found that Rogers showed deliberate

indifference under *Farmer v. Brennan*, 511 U.S. 825 (1994), and *Howard v. Waide*, 534 F.3d 1227 (10th Cir. 2008). *See* Doc. 47 at 19-31. The analogies to these cases fall apart, however, in light of the undisputed fact that Rogers was offered a reasonable alternative to entering regular general population but after thoughtful deliberation chose against it. As defendants argued in their reply, Rogers' claim is completely different than in *Howard*, where prison officials twice refused the inmate's request to be moved to a more restrictive housing unit because he would not identify the gang members who were threatening him. *Id.* at 1231-34, 1241. Here, Rogers admits that he had a choice—albeit not his preferred one—and decided against protective custody.

Additionally, the Court misapprehended the facts regarding Rogers placement in general population after he was released from segregation on July 11, 2019. The evidence in the record shows that UTM English was consulted about whether Rogers should return to E-1 Cellhouse and recommended that he be transferred to D Cellhouse instead. Doc. 23-4 at 3. UTM English explained that based upon his review of Rogers' file and his previous observations, he had "some concerns" about Rogers returning to E-1 Cellhouse. *Id*; Doc. 23-8 at 7. UTM English in no way indicated that his concerns were related to Rogers' safety from other inmates. In fact, UTM English specifically stated that he "ha[d] no knowledge of how or why Offender Rogers came to be attacked in Cellhouse E-1 on July 19, 2019." Doc. 23-4 at 3.

Contrary to the record, the Court attributed Rogers' placement in D Cellhouse to "UTM English's *concerns about Rogers's safety* around July 11, 2019." Doc. 47 at 12 (emphasis added). There is no cite to the record for this point, and indeed the record does not support this conclusion. The only evidence as to why UTM English recommended D Cellhouse is his own statement, and Rogers has no personal knowledge of the basis for UTM English's concerns. *See* Doc. 42 at 17. UTM English indicates his concerns were not related to Rogers' safety. Yet, the

8

Court improperly relied on this fact in its analysis: "Ultimately, Rogers was placed in D cell house due to concerns that UTM English expressed about his ability to be housed safely in E cell house." Doc. 47 at 23. Reconsideration is proper based on these factual misapprehensions.[1]

## II.   There is no evidence that Warden Cline knew of a risk of harm to Rogers.

The Court included a lengthy factual background in its opinion. Doc. 47 at 2-14. Many of the facts recited relate to events at other Kansas Department of Corrections (KDOC) facilities. The majority of the events predate Warden Cline's tenure, which began in October 2018. Building on this factual background, much of the deliberate indifference analysis relies on the knowledge of KDOC officials or EDCF officials, collectively.

The Court recognized that Rogers needed to show that each defendant personally had actual knowledge of the risk of serious harm, but its analysis does not point to any specific facts that show Warden Cline had actual knowledge. It claims that "Rogers alleges that Cline had personal notice of the threat to his safety and failed to act accordingly," but there is no evidence to support this conclusory assertion. Similarly, the Court relies on "Warden Cline's knowledge

---

[1]   There are many other mistakes in the opinion's factual background section, as well as the analysis section, that cast doubt on whether the parties' positions were properly understood.
   For example, on pages 12-12, the Court indicated that "the form signed by Rogers in April 2019 in conjunction with the incident between Roger and his cell mate . . . resulted in Rogers's temporary placement in A cell house prior to his release to D cell house at UTM English's suggestion." There is no indication in the record that these events are related. The April 2019 form pertained to Rogers and his cell mate "cuddling." Doc. 23-5 at 1. Rogers' placement in segregation on prehearing detention related to disciplinary reports for misusing medication and dangerous contraband. Doc. 23-8 at 6.
   As another example, on page 9, after describing UTM English's June 21, 2019 email related to Rogers moving from Managed Movement Unit to general population, the Court cites to Rogers' statement related to his release from segregation on July 11, 2019.
   And on page 27, the Court refers to "the incident report prepared after the June 25, 2019 stabbing incident." All agree, however, the incident took place on July 19, 2019.

9

of Rogers's history with the white supremacy/Aryan Brotherhood threat group and his knowledge of Rogers's complaints about those inmates in EDCF." But Rogers did not bring his issues to the attention of Warden Cline personally until he filed grievances after the incident in question. *See* Doc. 26-1 at 28, 31.

It appears the Court improperly imputed knowledge of all KDOC records that existed to Warden Cline, as Rogers offers no evidence to support he had actual knowledge of his issues until after the attack. The Tenth Circuit has rejected such an approach. "Plaintiff fails to demonstrate how one can infer the Warden was aware of the facts that predated his tenure." *Vega v. Davis*, 673 F. App'x 885, 891 (10th Cir. 2016). "[T]he mere presence of records, by themselves, does not create the reasonable inference that [the Warden] read them. The plaintiff fails to explain why it is reasonable to infer that a warden would review all of the records of each inmate . . . or [his] in particular." *Id.* (citation omitted). The Court erred in finding a constitutional violation by Warden Cline on this record.

### III. The Court erred in its qualified immunity analysis by defining the right at issue at a high level of generality rather than accounting for the circumstances.

Finally, the Court clearly erred in its qualified analysis. The opinion devotes merely two paragraphs to the key question: "Was the constitutional right clearly established?" Doc. 47 at 31. In summary fashion, it is asserted that "prisoners have a constitutional right to reasonable protection from attacks by other inmates" and "[c]ase law from the United State Supreme Court and Tenth Circuit is well-settled on this point." Doc. 47 at 31-32.

This general proposition is inadequate, however, to show that Warden Cline and UTM English violated clearly established law. "[T]he clearly established right must be defined with specificity," and the Supreme Court "has repeatedly told courts . . . not to define clearly

10

established law at a high level of generality." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503, (2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)). In *City of Escondido*, the Supreme Court found the lower court's "formulation of the clearly established right was far too general" where it was "defined . . . by saying only that the 'right to be free of excessive force' was clearly established." *Id.* Instead, the Court advised it should look to whether the law was clearly established with regards to the specific circumstances of the case.

Here, the Court failed to undertake this context-specific analysis. Defendants cited several cases with similar facts in support of their argument that the law was not clearly established as to the circumstances in this case. *See* Doc. 35 at 13-16. These cases are set forth in the table below:

| *Dumas v. Easter*, No. 19-3247-SAC, 2020 WL 4530473, at *2-3 (D. Kan. Aug. 6, 2020) | "Plaintiff does not have a constitutional right to dictate where he or other inmates are housed. Courts must take into account that jail officials are entitled to great deference in the internal operation and administration of the facility." |
|---|---|
| *Ross v. Addison*, 645 F. App'x 818, 821 (10th Cir. 2016) | "Prison officials could not have been consciously aware of a substantial risk" where inmate "felt sufficiently safe" to postpone his requested move. |
| *Rider v. Werholtz*, 548 F. Supp. 2d 1188, 1199 (D. Kan. 2008) | "A prisoner is entitled to adequate protection from harm, but is not entitled to direct prison officials on the means to accomplish it." |
| *Dickey v. Merrick*, 190 F. App'x 692, 694 (10th Cir. 2006) | No deliberate indifference shown when inmate "made an informed decision to risk his own safety by choosing to go to the recreation yard" where a specific class of inmates were present and was subsequently attacked. |
| *Faulkner v. Litscher*, 130 F. App'x 812, 813 (7th Cir. 2005) | No deliberate indifference when inmate who was threatened by gang members expressed desire to remain in the general population and declined the option of transferring to segregation; "The fact that [the inmate] might have made a bad choice because |

11

|  | the threatened violence was ultimately not averted does not make for a constitutional violation." |
|---|---|
| *Benner v. McAdory*, 165 F. Supp. 2d 773, 779 (N.D. Ill. 2001), *aff'd*, 34 F. App'x 483 (7th Cir. 2002) | No Eighth Amendment claim against prison official when inmate's own decision to leave sick call and the dayroom without an escort and approach the cell of another inmate was the proximate cause of his injury. |

Defendants also submitted a Notice of Supplemental Authority on January 8, 2021, providing the Court with yet another case showing the law was not clearly established. Doc. 45. In *White v. Stephenson*, 833 F. App'x 217, 218 (10th Cir. 2021), the Tenth Circuit affirmed a district court's grant of qualified immunity on the ground that the law was not clearly established for a failure-to-protect claim.

In *White*, the inmate alleged he told a defendant "that he was at risk of being harmed by the members of the Bloods gang if he were transferred to general population," and that the defendant "was deliberately indifferent . . . when he knowingly disregarded this risk and failed to prevent his transfer." *White v. Stephenson*, No. 19-CV-00875-RBJ-NRN, 2020 WL 2832380, at *7 (D. Colo. June 1, 2020). The district court listed the inmate's circumstances: "he told [the defendant] about a previous altercation with members of the Bloods gang, that he has 'many verifiable custody issues' logged by the [] Intelligence Unit, and that he believed that if he were placed in general population, his life would be in danger due to retaliation from other gang members." *Id.* The inmate further alleged that "he requested protective custody," but the defendant failed to "make any effort to stop his transfer or initiate procedures for protective custody." *Id.*

While the district court did not decide whether the defendant's actions constituted a

12

constitutional violation, it found that "under existing law such a violation was not clearly established" as of January 2021. *Id.* at *8. The closest case it found was *Verdecia v. Adams*, 327 F.3d 1171, 1176 (10th Cir. 2003). The district court noted that while "it is possible that the prison officials in *Verdecia* were more diligent that [the defendant]," he "provided [the inmate] with some information about protective custody and attempted to verify whether there was a risk of harm." *Id.* at *8. The Tenth Circuit "affirm[ed] the district court for substantially the same reasons it relied upon." 833 F. App'x at 218.

In its perfunctory analysis of clearly established law, the Court did not confront these cases. Although not binding authority, these cases suffice to show that the law was not clearly established with regards to the specific circumstances in this case. *See Grissom v. Roberts*, 902 F.3d 1162, 1168 (10th Cir. 2018) ("[A]n unpublished opinion can be quite relevant in showing that the law was *not* clearly established."). "The purpose of the qualified-immunity test is to limit liability to those public officials who are 'plainly incompetent or . . . knowingly violate the law.'" *Id.* (quoting *Kisela*, 138 S. Ct. at 1152). "Could we properly say that an official was plainly incompetent for taking guidance from an unpublished appellate opinion?" *Id.*

Here, Rogers did not show that it was a clearly established failure-to-protect violation to allow him to enter the general population. He did not point to any case that would have put Warden Cline or UTM English on notice that their actions amounted to an Eighth Amendment violation. Nor could he, as the cases cited above show that the right is not clearly established. There is no dispute that UTM English, like the defendant in *White*, made an effort to verify whether there was a risk of harm. *See* June 21, 2019 Email, Doc. 23-14. Rogers admits he could have sought transfer to protective custody from English, but he did not. This recent decision alone shows that UTM English's actions did not violate clearly established law.

13

In addition to being clearly erroneous, the Court's denial of qualified immunity to Warden Cline and UTM English amounts to "manifest injustice." D. Kan. Rule 7.3(b)(3). As the Supreme Court has emphasized, "qualified immunity is important to society as a whole and . . . is effectively lost if a case is erroneously permitted to go to trial." *White v. Pauly*, 137 S. Ct. 548, 551 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)) (internal quotation marks omitted).

## Conclusion

The Court should reconsider whether Warden Cline and UTM English are entitled to summary judgment on the grounds of qualified immunity. The opinion denying them qualified immunity was based on misapprehension of the facts, which led the Court astray in its analysis. The undisputed facts, supported by additional new evidence, make clear that Rogers chose to enter general population rather than protective custody. Given the numerous cases finding that allowing an inmate to make such a decision does not constitute deliberate indifference, the Court clearly erred in finding Warden Cline and UTM English violated clearly established law.

Respectfully submitted,

OFFICE OF THE ATTORNEY GENERAL
DEREK SCHMIDT

s/ Kathleen M. Barceleau
Kathleen M. Barceleau, KS No. 28401
Assistant Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas, 66612-1597
Phone: (785) 296-2215
Fax: (785) 291-3767
Email: kathleen.barceleau@ag.ks.gov
*Attorney for Defendants*

## CERTIFICATE OF SERVICE

      I certify that May 11, 2021 the foregoing was electronically filed with the clerk of the court using the CM/ECF system and a copy was mailed first-class, postage prepaid to:

Plaintiff pro se      Michael W. Rogers, #115224
                        Hutchinson Correctional Facility
                        PO Box 1568
                        Hutchinson, KS 67504


                                        s/ Kathleen M. Barceleau
                                        Kathleen M. Barceleau
                                        Assistant Attorney General