## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**MICHAEL W. ROGERS,**

**Plaintiff,**

**v.**

**SAM CLINE, et al.,**

**Defendants.**

**Case No. 19-3145-JAR-ADM**

## MEMORANDUM AND ORDER

Plaintiff Michael W. Rogers, a prisoner proceeding pro se and in forma pauperis, alleged civil rights claims against Defendants Sam Cline, Warden of the El Dorado Correctional Facility ("EDCF"); EDCF Unit Team Manager Richard English; and Special Agent Brett Sissell in their individual capacities.[1]  On April 27, 2021, the Honorable J. Thomas Marten issued a Memorandum and Order ruling on Defendants' Motion to Dismiss/Motion for Summary Judgment ("April 27 Order").[2]  The April 27 Order granted summary judgment in favor of Defendant Sissal and denied summary judgment as to Defendants Cline and English under the doctrine of qualified immunity.

This case was eventually reassigned to the undersigned due to Judge Marten's retirement. Before the Court is Defendants Cline and English's Motion to Reconsider (Doc. 52) the April 27 Order denying summary judgment to Cline and English based on qualified immunity.  The motion is fully briefed, and the Court is prepared to rule.  As described more fully below, the

---

[1] Plaintiff moved for and was granted leave to amend after Defendants moved to dismiss.  The Amended Complaint removed all claims against Defendants in their official capacities.  Doc. 86.

[2] Doc. 47.

Court grants the motion to reconsider as to Defendant Cline only.  The motion is denied as to Defendant English.

## I.      Standards

D. Kan. Rule 7.3(b) governs motions to reconsider non-dispositive orders, while Fed. R. Civ. P. 59(e) and 60 govern motions to reconsider dispositive orders.[3]  A party may seek reconsideration on the following grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error or prevent manifest injustice.[4] While a motion to reconsider is available where the court has "misapprehended a party's position, the facts or applicable law, or where the party produces new evidence that it could not have obtained earlier through the exercise of due diligence," such a motion is "not a second opportunity for the losing party to make its strongest case, to rehash arguments or to dress up arguments that previously failed."[5]  Whether to grant a motion for reconsideration is left to the court's discretion.[6]

Defendants also invoke Fed. R. Civ. P. 54(b), which provides that "any order or other decision, however designated, that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment adjudicating all the claims."  When considering an "interlocutory" motion under Rule 54(b), "'the district court is not bound by the strict standards for altering or amending a judgment encompassed in Federal Rules of Civil Procedure 59(e) and

---

[3] D. Kan. R. 7.3(b); *Coffeyville Res. Refin. & Mktg., LLC v. Liberty Surplus Ins. Corp.*, 748 F. Supp. 2d 1261, 1264 (D. Kan. 2010).

[4] D. Kan. R. 7.3(b); *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) (citing *Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 948 (10th Cir. 1995)).

[5] *Bedivere Ins. Co. v. Blue Cross & Blue Shield of Kan., Inc.*, 491 F. Supp. 3d 929, 936 (D. Kan. 2020) (quoting *Skepnek v. Roper & Twardowsky, LLC*, No. 11-4102-KHV, 2012 WL 5907161, at *1 (D. Kan. Nov. 26, 2012)) (citations omitted).

[6] *Id.* (citation omitted).

60(b),' which govern a district court's reconsideration of its final judgments."[7]  Such a motion is left to the court's discretion.[8]

## II.     The April 27 Order

In his April 27 Order, Judge Marten considered Defendants' motion to dismiss, or in the alternative for summary judgment, as to Plaintiff's remaining claims that Defendants Cline, English, and Sissal were responsible for Plaintiff's release into the general population at EDCF, where he was attacked and stabbed multiple times by inmates affiliated with the Aryan Brotherhood gang on July 19, 2019, in violation of the Eighth Amendment.  Judge Marten treated the motion as one for summary judgment because he relied on matters outside the pleadings.  He then applied the burden-shifting framework applicable to summary judgment motions that raise the issue of qualified immunity.  Under that framework, the plaintiff must first show that (1) the defendant violated his constitutional or statutory rights; and (2) the right was clearly established at the time of the alleged unlawful activity.[9]  The court may decide the appropriate order to consider these issues.[10]  Only if the plaintiff clears these hurdles does the burden shift back to the movant defendant to make the traditional showing that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law.[11]  In determining whether the plaintiff has demonstrated a violation of his constitutional rights and

---

[7] *Spring Creek Expl. & Prod. Co. v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1024 (10th Cir. 2018) (quoting *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 n.2 (10th Cir. 2008)).  The Court is free to reconsider its interlocutory orders "even when a case is reassigned from one judge to another in the same court."  *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1251 (10th Cir. 2011).

[8] *Spring Creek Expl. & Prod. Co.*, 887 F.3d at 1024.

[9] *Ullery v. Bradley*, 949 F.3d 1282, 1289 (10th Cir. 2020) (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)).

[10] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[11] *Keith v. Koerner*, 843 F.3d 833, 837 (10th Cir. 2016) (citing *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008)).

whether the right was clearly established at the time, the court must view the facts and draw reasonable inferences in the light most favorable to the party opposing summary judgment.[12]

As to the claims against Cline and English, Judge Marten determined that the summary judgment record, when viewed in the light most favorable to Plaintiff, demonstrated: (1) Plaintiff's injuries were sufficiently serious to implicate his Eighth Amendment rights; (2) Cline and English were subjectively aware of an obvious risk to Plaintiff's safety if he was placed in a housing situation with Aryan Brotherhood gang members, were aware of the history of violence between Plaintiff and that group, and were aware of specific threats of violence by members of that group made to Plaintiff if he was returned to the general population; (3) Cline and English had actual knowledge of threats to Plaintiff sufficient to support liability; (4) Cline's and English's responses to these known threats were not reasonable; (5) Plaintiff's constitutional right to reasonable protection from attacks by inmates was clearly established; and (5) genuine issues of material fact precluded summary judgment in favor of Cline and English.

## III.    Discussion

Defendants ask this Court to reconsider the April 27 Order on the basis that it misapprehended the facts, law, and Defendants' position.  First, Defendants challenge the court's failure to deem uncontroverted that Plaintiff requested placement in the EDCF general population just prior to his attack, and that if he had requested placement in restrictive housing, the request would have been granted.  Had the court properly found these facts uncontroverted, Defendants urge, it would have concluded that Defendants were not deliberately indifferent. Second, Defendants challenge the court's finding that Cline had specific knowledge of the risk to Plaintiff if he was transferred to the EDCF general population.  Finally, Defendants challenge the

---

[12] *Scott v. Harris*, 550 U.S. 372, 376–80 (2007).

court's determination that Plaintiff's constitutional right to reasonable protection from attacks by inmates was clearly established because the court defined the right too generally.  The Court addresses each argument in turn.

### A.     Evidence Regarding Plaintiff's Waiver of Protective Custody

Under the first prong of the qualified immunity test, Plaintiff was required to show that each defendant violated the Eighth Amendment duty to protect Plaintiff from violence at the hands of other prisoners.  A violation of this duty requires two showings:

> First, the alleged deprivation must be "sufficiently serious" under an objective standard. In cases involving a failure to prevent harm, this means that the prisoner must show that the conditions of his incarceration present an objective "substantial risk of serious harm."
>
> Second, the prisoner must show that prison officials had subjective knowledge of the risk of harm. In other words, an official "must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." This knowledge may be proved "in the usual ways, including inference from circumstantial evidence, and a fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."[13]

According to the facts set forth in the April 27 Order, Plaintiff was transferred to Kansas Department of Corrections ("KDOC") custody in January 2017 from Florida because he testified against certain individuals in gang and drug-related cases.  He was eventually housed at the Hutchinson Correctional Facility ("HCF") as a maximum security prisoner in the general population.  Plaintiff was threatened by an inmate who had also been transferred from Florida and had spread information to gangs within the KDOC—the Aryan Brotherhood and the Crips— about Plaintiff's cooperation in Florida.  After reporting these threats to KDOC officials,

---

[13] *Howard v. Waide*, 534 F.3d 1227, 1236 (10th Cir. 2008) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994)) (citations omitted).

Plaintiff was segregated and then transferred to the EDCF and placed in the general population. Two days after his transfer to EDCF, Plaintiff was attacked by two inmates, causing significant injuries.  Plaintiff told KDOC officials that he did not know the attackers, but that he was certain the orders came from three specific individuals and had been sanctioned by the Kansas Aryan Brotherhood gang.  A KDOC Administrative Segregation Report supports Plaintiff's claim that the perpetrators of his attack were "members of the STG, White/Supremacy/Hate Group."[14]

After this attack, Plaintiff was granted "Low/Medium Custody by Exception" status and transferred to the Norton Correction Facility ("NCF") on August 22, 2017.  In January 2018, due to  disciplinary infractions at NCF, Plaintiff lost his status as a low/medium custody by exception inmate and was transferred back to EDCF on February 6, 2018.  Soon after he returned to EDCF, Plaintiff reported threats by members of the Aryan Brotherhood group.

The parties dispute several facts about what happened after these threats in early 2018.  It is undisputed that between April 2018 and June 25, 2019, EDCF cellhouse E1 was called the "Managed Movement Unit" ("MMU"), an experimental housing unit that provided an alternative to protective custody for those prisoners who qualified for protective custody, allowing for some additional privileges similar to the general population.  Plaintiff was housed in the MMU from May 23, 2018 until August 22, 2018, when he was placed in segregation for nine days due to a disciplinary infraction.  He was returned to the MMU until December 6, 2018, when he received another disciplinary report, at which point he was deemed "no longer a good candidate for the [MMU] due to his maladaptive behaviors."[15]  He was placed on "Protection from Other

---

[14] Doc. 26-1 at 9.

[15] Doc. 23-8 ¶ 16.

Offenders" status, yet on January 31, 2019, he was released from that status and returned to the MMU until the MMU was disbanded on June 25, 2019.

According to evidence included in the *Martinez* Report, Plaintiff signed two forms entitled "Acknowledgement & Release from Protective Custody" during his time in the MMU. These forms state that Plaintiff

> request[s] of my own free will not to be placed in Restrictive Housing on Protective Custody Status or have requested to be released from Protective Custody Status.  I have full knowledge of the potential consequences of this action.  However, at this time I do not believe I would be in any danger in the General Population. Pursuant to KAR 44-14-302(a) I further understand and have been made aware that should I need protective custody in the future, I may request it at any time.  I hereby release and hold harmless the State of Kansas, Department of Corrections, El Dorado Correctional Facility, their officers, and employees of any liability, which might result from my decision to voluntarily, refuse/relinquish Protective Custody Status.[16]

On the first form Plaintiff signed upon his initial placement in the MMU dated May 9, 2018, a comment states: "Offender is signing this PC Waiver to become part of the [MMU].  Offender will not be returned to the General Population Unit until they are ready to progress to a General Population setting at a facility within the state of Kansas appropriate for his custody level."[17] The second form was signed on April 19, 2019, after a report that Plaintiff was "cuddling with his cellmate."[18]

Defendants relied on affidavits in the *Martinez* Report from English and Maria Bos, stating that all inmates in the MMU were offered the option of either moving to the EDCF general population or protective custody, and Plaintiff chose placement in the general

---

[16] Doc. 23-5 at 1–2.

[17] *Id.* at 2.

[18] *Id.* at 1.

population.[19]  Defendants submit additional evidence not included in the *Martinez* Report with

their motion to reconsider—a mental health counselor's notes from a June 20, 2019 mental status

exam with Plaintiff, during which he discussed "making the best possible decisions for his safety

and his future."[20]  Defendants argue that when considering along with the evidence in the

*Martinez* Report, these notes establish that the day after Plaintiff's exam when he indicated he

was considering where to elect placement, English sent an email to EDCF's Enforcement,

Apprehension, and Investigations Unit ("EAIU") conveying that Plaintiff requested placement in

EDCF general population, and asking if there were objections.[21]  Defendants also point to a

counselor's note in the *Martinez* Report that indicates Plaintiff reported feeling "fine now that his

gang affiliation has been clarified.  He feels as if other gang members were trying to kill him due

to not understanding who he was affiliated with."[22]

    According to Defendants, this evidence read together conclusively shows that Plaintiff

opted to remain in the general population at EDCF, despite the opportunity to elect protective

custody, and therefore, prison officials could not have acted unreasonably by granting his

request.  Defendants argue that the April 27 Order misapprehended the facts and their position by

failing to deem these facts uncontroverted, and by failing to find that they negated Plaintiff's

ability to prove an Eighth Amendment violation.  Essentially, Defendants claim that there is no

genuine issue of material fact that Plaintiff waived the right to challenge his placement in the

EDCF general population when the MMU was disbanded because he was given a choice

---

[19] Doc. 23-4 ¶¶ 8–10; Doc. 23-8 ¶¶ 19–20.

[20] Doc. 52-1.

[21] Doc. 23-14.

[22] Doc. 23-15 at 1.

between general population and protective custody and chose placement in the general population.

The Court denies Defendants' motion to reconsider on this basis for several reasons. First, Defendants wholly ignore Judge Marten's finding that Plaintiff's response brief, signed under oath, and his request for transfer to another facility submitted to English on June 5, 2019, created a genuine issues of material fact about whether Plaintiff was offered and declined placement in protective custody when the MMU disbanded.  Defendants did not submit a written record showing that all inmates were offered the opportunity to be placed in protective custody. There is no contemporaneous request for placement in the general population or refusal to be placed in protective custody by Plaintiff in writing.  And there is also no release form in the record signed by Plaintiff in conjunction with the MMU's closure on June 25, 2019.  The most recent form he signed was in April 2019, and the form indicates that it was executed based on a specific incident rather than in response to the MMU disbanding.[23]  On June 5, 2019, Plaintiff requested placement at another facility because he "can't be" placed in the general population at EDCF; he implored English that he would be hurt and asked what the final outcome would be. English responded to the request by stating that he was "aware of the situation and it will be dealt with."[24]

Defendants rely on English's affidavit to establish that each inmate was offered the option of protective custody, and that Rogers orally conveyed to English his request for placement in the general population.  Defendants also point to an email from English that conveyed Plaintiff's request for general population to the EAIU.  But in the response, Plaintiff

---

[23] This form was executed months before Defendants claim Plaintiff decided to waive protective custody after the MMU disbanded.

[24] Doc. 26-1 at 23.

denied being offered an option of protective custody, and denies that he requested placement in the general population, creating a genuine issue of material fact. His June 5, 2019 request form submitted to English further supports his claim that he did not wish to be placed in the general population at EDCF, and that he requested protection from the threats he had received.

The June 20, 2019 mental health note submitted with the motion to reconsider does not change this analysis. Defendants fail to quote or acknowledge that at his June 20 mental health exam, Plaintiff relayed "high anxiety related to upcoming changes in the cell house," and "feelings of frustrations related to feeling coerced into being attacked, having to resort to violence, or being punished and shunned away in the hole for wanting to stay out of trouble."[25] And the July 1 notes do not demonstrate that Plaintiff affirmatively requested placement in the general population. Viewed in the light most favorable to Plaintiff, the July1 mental health notes suggest that Plaintiff was feeling better about his safety in general population after his transfer, not that he requested placement there.

Second, Defendants' argument is not well taken that Judge Marten erred by failing to deem their facts admitted on these points because Plaintiff failed to specifically controvert them in the response brief. Fed. R. Civ. P. 56(e) does not require the Court to deem facts admitted when the nonmoving party fails to specifically controvert them by paragraph number in the response.[26] And given Plaintiff's status as a pro se litigant,[27] and the fact that his response,

---

[25] Doc. 52-1.

[26] Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court *may* . . . (2) consider the fact undisputed for purposes of the motion . . . ." (emphasis added)).

[27] Pro se prisoners are entitled to a liberal construction of their filings. *See, e.g.*, *Toevs v. Reid*, 685 F.3d 903, 911 (10th Cir. 2012) (citing *United States v. Clingman*, 288 F.3d 1183, 1187 (10th Cir. 2002)).

which directly controverts these facts, was signed under oath,[28] the court did not clearly err by declining Defendants' invitation to deem certain facts admitted on summary judgment.

Third, the court did not misapprehend the facts surrounding Plaintiff's placement in the D-cell house on July 11, 2019.  According to English's affidavit, after the E1 cellhouse was returned to general population status, Plaintiff committed a disciplinary infraction.  English stated that he had "some concerns about Offender Rogers and based upon my review of his file and my previous observations [I] recommended that he be transferred to D Cellhouse instead which is where [he] was housed on July 19, 2019."[29]  When viewed in the light most favorable to Plaintiff, Judge Marten found that this evidence suggests English moved Plaintiff to the D cell block due to concerns about his safety.

In their motion to reconsider, Defendants once again argue that English's affidavit does not support the fact that English was concerned about Plaintiff's safety.  And they point to English's statement in his affidavit that he had no knowledge about how or why Plaintiff was attacked on July 19, 2019.  Defendants once again fail to recognize the applicable standard for the court's review of this evidence—it must be read in the light most favorable to Plaintiff, even though Plaintiff carries the initial burden of proof.  Judge Marten determined that when viewed in the light most favorable to Plaintiff, English's "concerns . . . based upon my review of his file and my previous observations" would have included the many safety threats that Plaintiff had documented in his file by that time, including a form he submitted to English one month before explicitly stating that he would be "hurt" if placed in the general population.[30]  It was not a

---

[28] *Longstreth v. Maynard*, 961 F.2d 895, 902 (10th Cir. 1992) (considering prisoner's brief signed under penalty of perjury as an affidavit).

[29] Doc. 23-4 ¶ 11.

[30] Doc. 26-1 at 23.

misapprehension of the facts for Judge Marten to conclude that a reasonable factfinder could determine that English's "concerns" included prior gang-related threats of violence against Plaintiff.

Finally, Tenth Circuit authority does not require reconsideration of the qualified immunity ruling on this basis.  The April 27 Order chronicles both circumstantial evidence that the risk to Plaintiff should have been obvious to EDCF officials, and direct evidence that they knew of specific threats to Plaintiff made by members of the Aryan Brotherhood.  As the Tenth Circuit has explained, "[r]egardless of how prison officials become subjectively aware of a substantial risk of serious harm to an inmate—and indeed, even in situations where the prisoner himself remains oblivious to the potential harm—the Eighth Amendment requires them to respond reasonably."[31]  To be sure, there is unpublished case law from the Tenth Circuit suggesting that a prisoner's rejection of an offer of protective custody is a factor that militates against finding that an official was deliberately indifferent.[32]  However, such rejection is only a factor, albeit a strong one, to be considered in the deliberate indifference analysis.  Given that the

---

[31] *Howard v. Waide*, 534 F.3d 1227, 1237 (10th Cir. 2008).

[32] *Brigden v. Oklahoma ex rel. Okla. Dep't of Corrs.*, No. 96-3339, 1997 WL 687674, at *7 (10th Cir. Oct. 29, 1997) (considering undisputed fact that inmate had twice declined an offer of protective custody and stating "it is hard to see why Brigden's own view of his safety would not at least be one factor in evaluating whether or not prison officials were subjectively criminally reckless in perceiving an unreasonable risk to Brigden, in actually drawing the inference, and in failing to act." (citing *Knight v. Gill*, 999 F.2d 1020, 1022 (6th Cir. 1993))); *see also Rider v. Werholtz*, 548 F. Supp. 2d 1188, 1198 (D. Kan. 2008) ("Even where the defendants actually knew of a substantial risk of serious harm to the plaintiff, an 'offer of protective custody' 'tends to refute a claim that prison staff acted with deliberate indifference to any such risk.'" (quoting *Welch v. Penn. Dep't of Corrs.*, 269  F. App'x 223, 225 (3d Cir. 2008))); *Belcher v. Loftness*, No. 03-3261-JWL, 2005 WL 2323222, at *5 (D. Kan. Sept. 22, 2005) ("[R]efusal to enter protective custody is a significant factor in evaluating whether prison officials were subjectively criminally reckless in perceiving an unreasonable risk to plaintiff, in actually drawing the inference, and in failing to act." (citing *Brigden*, 1997 WL 687674, at *7)); *Brown v. Ellis*, No. 97-1873, 1999 WL 197222, at *1 (7th Cir. Mar. 26, 1999) ("[The prisoner] contends, however, that, because he did not want to return to segregation, Ellis and Rees should have placed him in some other location in the prison.  Brown is simply wrong.  By offering to allow Brown to remain in segregation, Ellis and Rees took a reasonable step to protect Brown from harm." (citations omitted)); *Zatler v. Wainwright*, 802 F.2d 397, 403 (11th Cir. 1986) (finding that plaintiff could not show deliberate indifference where he could not show he was ever refused protective custody when he requested it).

offer and rejection of protective custody is a disputed fact, Judge Marten did not err by declining to apply this authority.

### B.    Cline

To show a constitutional violation by Cline, the Warden at EDCF at the time of Plaintiff's transfer to the EDCF general population, Plaintiff was required to show that he "personally committed a constitutional violation."[33]  For supervisory liability to attach, Plaintiff "'must show an "affirmative link" between [the warden] and the constitutional violation,' which requires proof of three interrelated elements: (1) personal involvement; (2) causation; and (3) state of mind."[34]  "A warden is not liable for an isolated failure of his subordinates to carry out prison policies, however—unless the subordinates are acting (or failing to act) on the warden's instructions."[35]

Defendants argue that there was no evidence cited in the April 27 Order to support Cline's actual knowledge of threats to Plaintiff before his attack on July 19, 2019.  Defendants complain that the court instead imputed knowledge by other EDCF officials to Cline.  Plaintiff responds that Cline made the decision to disband the MMU without ensuring the safety of prisoners who qualified for protective custody, and that he signed off on the decision to allow Plaintiff back in the general population.  Plaintiff further argues that Cline should have been on notice as of December 6, 2018, that Plaintiff could not be housed in the general population because on that date, he was temporarily placed in segregation instead of the general population

---

[33] *Keith v. Koerner*, 843 F.3d 833, 837 (10th Cir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

[34] *Id.* (alteration added) (quoting *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013)).

[35] *Rider*, 548 F. Supp. 2d at 1200 (quoting *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998)).

due to a disciplinary infraction for the safety of himself and others, and Cline was copied on the report.

As the April 27 Order acknowledges, Cline became Warden at EDCF in October 2018, more than one year after Plaintiff's first attack and after his grievances documenting security threats and requesting transfer to another facility were filed and denied.  By the time Cline arrived at EDCF, Plaintiff had already been assigned to the MMU.  There is no evidence that Plaintiff submitted a grievance complaining of gang-related threats or of the decision to place him in the EDCF general population before the MMU was disbanded; he submitted a grievance to Cline after the July 2019 attack.[36]

In fact, the only form referenced in the April 27 Order that was provided to the Warden's office between October 2018 and July 19, 2019 is the report from December 6, 2018, indicating that Plaintiff had been placed in segregation after a disciplinary infraction in the MMU.  This form does not mention gang-related threats to Plaintiff.  It references Plaintiff's "maladaptive behaviors," which made continued placement in the MMU inappropriate.  "Therefore, [Rogers'] placement in segregation is needed at this time to maintain the safe and secure function of the facility."[37]  When viewed in the light most favorable to Plaintiff, a reasonable jury could not find that this form put Cline on notice that Plaintiff could not be placed in the general population due to a threat risk from the Aryan Brotherhood gang.  The only reasonable reading of this form is that Plaintiff was placed in administrative segregation based on his own "maladaptive" behavior.

There is no evidence in the summary judgment record that Cline otherwise had knowledge of Plaintiff's history with the Aryan Brotherhood gang, or of Plaintiff's past

---

[36] There is no indication that the June 5, 2019 Request for Interview form was submitted to anyone other than English.  Doc. 26-1 at 23.

[37] *Id.* at 21.

complaints about gang-related threats given that Cline was not Warden in 2017 and 2018 when those incidents were documented.  As Plaintiff admits in his affidavit, he had no complaints about his safety during his placement in the MMU, which is where he was placed during the entire period of Cline's tenure as warden before it was disbanded and Plaintiff was attacked.[38]

The April 27 Order references Plaintiff's allegations that Cline had personal notice of the threat to his safety and failed to act, and that Cline would have been aware of KDOC policies governing protective custody, including the requirement that when an inmate leaves protective custody he must sign a release.  The April 27 Order concluded that the failure to ensure that a release was signed combined with EDCF officials' decision to return Plaintiff to the general population, could lead a reasonable jury to conclude that Cline was aware of a substantial risk of harm to Plaintiff and failed to ensure that his subordinates took reasonable steps to ensure Plaintiff's safety.

The Court respectfully concludes that this evidence was insufficient to demonstrate personal participation by Cline in the alleged constitutional violation.  Plaintiff's allegations about Cline's knowledge on this point are conclusory—he has no personal knowledge about what Cline knew of Plaintiff's history or specific threats made to him after October 2018. Moreover, the April 27 Order found as undisputed that the MMU was not considered protective custody.  It was an experimental unit that allowed inmates who otherwise qualified for protective custody to enjoy some benefits typically only available to the general population.  In fact, Plaintiff completed a release on May 9, 2018, stating that he voluntarily relinquished his protective custody status in order to be placed in the MMU.  While it is true that the form indicates that he would not be returned to general population "until they are ready to progress to

---

[38] Doc. 26 ¶ 16.

a General Population setting at a facility . . . appropriate for his custody level," there is no KDOC policy in the record that required another waiver be signed before transfer given that the MMU was not considered protective custody.[39]  While a release would have been strong evidence that Plaintiff affirmatively opted for placement in the general population after the MMU disbanded, KDOC policies do not state that this was required given the experimental status of the MMU.

Additionally, assuming as true that a release form was required and English failed to obtain one from Plaintiff, there is no evidence that this was anything more than an "isolated failure of [Cline's] subordinates to carry out prison policies."[40]  Plaintiff comes forward with no evidence that English failed to follow KDOC policy or that Cline directed him not to follow KDOC policies regarding protective custody for prior MMU inmates.  Because Plaintiff failed to show that Cline personally participated in the alleged constitutional violation, the Court agrees that reconsideration is warranted as to Cline only.  And because Plaintiff does not meet his burden of demonstrating that Cline personally committed a constitutional violation, Cline is entitled to qualified immunity.

### C.    Clearly Established Prong

Finally, Defendants argue that the April 27 Order misapprehended the law by defining the constitutional right at a high level of generality, rather than considering the particular facts of this case.  When framing the constitutional right at issue in this case, Defendants urge the Court to consider that Plaintiff was offered and rejected protected custody status, and that his requests for protection sought a classification change so that he could transfer to another prison, rather than a request for protective custody.  A plaintiff may satisfy the "clearly established"

---

[39] *See* Doc. 23-9 at 43–55.

[40] *Rider*, 848 F. Supp. 2d at 1200.

requirement "by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, 'the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'"[41]  To apply this test, the Court "must not define the relevant constitutional right 'at a high level of generality.'"[42]  "[A] right is clearly established when a precedent involves '*materially similar conduct*' or applies '*with obvious clarity*' to the conduct at issue."[43]  "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'"[44]  To be "clearly established," "precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."[45]

Judge Marten determined that the law was clearly established at the time of the violation that prisoners have a constitutional right to reasonable protection from inmate attacks.  He also discussed at length how the facts of this case were materially similar to the Tenth Circuit's decision in *Howard v. Waide*, a Tenth Circuit decision stating that it is "unequivocally" established law that an inmate has an "Eighth Amendment right to be protected from substantial risks of sexual assault by fellow prisoners."[46]  Notably, like the defendants in *Howard*, prison

---

[41] *Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015) (quoting *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015)).

[42] *Perry v. Durborow*, 892 F.3d 1116, 1123 (10th Cir. 2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)).

[43] *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017) (quoting *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964–65 (10th Cir. 2016)).

[44] *Frasier v. Evans*, 992 F.3d 1003, 1021 (10th Cir. 2021) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)).

[45] *Wesby*, 138 S. Ct. at 590 (citing *Reichle v. Howards*, 566 U.S. 658, 666 (2012)).

[46] 534 F.3d 1227, 1242 (10th Cir. 2008) (first citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (physical and sexual assault); then citing *Gonzales v. Martinez*, 403 F.3d 1179, 1186 (10th Cir. 2005) (sexual assault); and then citing *Ramos v. Lamm*, 639 F.2d 559, 572 (10th Cir. 1980) (threats of violence and sexual assault)).

officials here responded to Plaintiff's requests for protection by stating they amounted to a change of housing classification that was not grievable.[47]

As already discussed, when the evidence is viewed in the light most favorable to Plaintiff, he did not request placement in the general population. He sought protection when the MMU was disbanded. In fact, Defendants' suggestion that Plaintiff had a duty to seek protective custody is misplaced under clearly established law. The Supreme Court emphasized in *Farmer v. Brennan* that it is the *prison officials'* duty, not the prisoner's duty, to protect inmates from violence at the hands of other inmates: "Having incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course."[48]

At the time of the alleged constitutional violation, the Tenth Circuit had determined that the Eighth Amendment duty to protect set forth in *Farmer* extended to materially analogous facts—where prison officials fail to take reasonable measures to protect prisoners from gang violence when the plaintiff requested protection and there was a history of gang threats and violence against that prisoner.[49] English's conduct in this case follows immediately from this

---

[47] *Howard*, 534 F.3d at 1241.

[48] *Farmer*, 511 U.S. at 833 (quoting *Hudson v. Palmer*, 468 U.S. 517, 525 (1984)) (further citations omitted).

[49] *See Wilson v. Falk*, 877 F.3d 1204, 1209 (10th Cir. 2017) (considering whether qualified immunity applied to case manager at prison who assigned the plaintiff to a unit where he had explicitly requested not to be placed due to threats of gang violence; "Defendants conceded that if this court were to find an Eighth Amendment violation on these facts, it would be a violation of clearly established law." (citing *Howard*, 534 F.3d at 1242)); *Howard*, 534 F.3d at 1242 (finding constitutional violation where there was evidence of a history of physical assaults in addition to defendants' knowledge of reported risks to the plaintiff's safety); *Gonzales*, 403 F.3d at 1187 ("The undisputed evidence of the physical assaults on inmates set against the facts of Sheriff Salazar's knowledge of reported risks to inmate health or safety . . . surely raise a reasonable inference that Sheriff Salazar knew of and disregarded an excessive risk to Ms. Gonzales."); *Ramos*, 639 F.2d at 572 ("[A]n inmate does have a right to be reasonably protected from constant threats of violence and sexual assaults from other inmates. . . . Moreover, he does not need to wait until he is actually assaulted before obtaining relief." (citations omitted)).

precedent, and Defendants' citation to contrary authority is either distinguishable or inapplicable.[50]  Thus, the Court finds no basis to reconsider the April 27 Order's finding that the law was clearly established as to the remaining claim against Defendant English.

## IV.     Conclusion

Under the applicable standards governing this motion to reconsider, the Court has reviewed the April 27 Order denying Defendants English and Cline's motion for summary judgment on the individual capacity claims based on qualified immunity.  The Court grants reconsideration as to the individual capacity claims against Cline and finds that he is entitled to qualified immunity and therefore must be dismissed.  The Court otherwise denies reconsideration; the individual capacity claims against English may proceed.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants Cline and English's Motion to Reconsider (Doc. 52) is **granted in part and denied in part**.  The motion is granted as to the remaining claims against Defendant Cline.  The motion is denied as to Defendant English.  Defendant Cline is hereby dismissed from this action.

**IT IS SO ORDERED.**

---

[50] *See White v. Stephenson*, 833 F. App'x 217, 218 (10th Cir. 2021) (affirming without detail or analysis district court's decision granting qualified immunity to defendants on failure-to-protect claim involving attack on prisoner by rival gang members because the law was not clearly established); *Ross v. Addison*, 645 F. App'x 818, 821 (10th Cir. 2016) (granting qualified immunity involving failure to protect prisoner from cellmate attack where it was undisputed that both the plaintiff and the cellmate had requested that prison officials postpone cell reassignment); *Dickey v. Merrick*, 190 F. App'x 692, 694 (10th Cir. 2006) (affirming district court's finding that the plaintiff did not establish deliberate indifference in part because it "carefully reviewed Appellant's claim but found that Appellant had made an informed decision to risk his own safety by choosing to go to the recreation yard when inmates 'on the behavior modification tier' were present").

The Court need not address Defendants' citations to district court decisions on this point.  *Ullery v. Bradley*, 949 F.3d 1282, 1300 (10th Cir. 2020) ("[D]istrict court decisions—unlike those from the courts of appeals—do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity." (quoting *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011))).

Dated: August 20, 2021

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE