IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MICHAEL W. ROGERS,

    Plaintiff,

    v.

RICHARD ENGLISH,

    Defendant.

Case No. 19-3145-JAR-ADM

**MEMORANDUM AND ORDER**

    Plaintiff Michel W. Rogers ("Rogers") brings this civil-rights action after he was brutally attacked by other inmates while incarcerated at the El Dorado Correctional Facility ("EDCF"). He alleges that defendant Richard English ("English"), a corrections officer and unit team manager, is responsible for the attack because he recklessly disregarded Rogers' safety by placing him in the prison's general population rather than in a protective-custody unit. This matter now comes before the court on English's Motion to Depose Plaintiff a Second Time. (ECF 134.) By way of this motion, English seeks leave to re-depose Rogers because the transcript of his first deposition is incomplete and inaccurate. English's motion is denied for two reasons. For one, English already had an opportunity to obtain whatever information he now seeks when he deposed Rogers the first time, and the circumstances that led to the deposition transcript being unusable were within English's counsel's control. Second, allowing a second deposition would not be proportional to the needs of the case.

**I.    BACKGROUND**

    Rogers filed this suit as a *pro se* litigant in August 2019. In screening the case under 28 U.S.C. § 1915A, the court dismissed Rogers' procedural-due-process claims but allowed his Eighth Amendment claims to proceed. (ECF 8, 28.) Subsequently, the court entered a scheduling order that

granted English leave to depose Rogers while he was incarcerated, set a deadline to do so of July 23, 2021, and allowed the deposition to be taken by telephone at English's option. (ECF 48, at 2 (citing FED. R. CIV. PRO. 30(a)(2)(B)).) On July 21, English deposed Rogers at Hutchinson Correctional Facility ("HCF").[1] (ECF 78.) The parties did not at that time notify the court—either formally or informally—that anything unusual occurred leading up to or during the deposition.

In September, the Kansas Department of Corrections ("KDOC") moved Rogers to a correctional facility in Arizona. On October 1, Rogers filed a motion to extend scheduling order deadlines in which he explained that he was still awaiting the transfer of some of his legal papers. (ECF 94.) That same day, counsel for English emailed the undersigned's chambers to alert the court that the court reporter had not yet produced a transcript of Rogers' deposition, and that the parties might jointly seek a stay so that English could obtain the transcript before filing dispositive motions, which were at that time due just one week later on October 8. (ECF 135, at 3.) The court convened a status conference on October 6. (ECF 96, 135.) During the conference, the court conveyed its surprise that English had not yet obtained the transcript of the deposition taken more than ten weeks earlier. The court held that the outstanding transcript was not good cause for a stay, noting,

> I understand, . . . you may be in a predicament because you haven't received [Rogers'] deposition transcript back, but frankly, that's just unacceptable, and so I'm not sure who all you're using for this deposition transcript, but that's pretty ridiculous. . . . [Y]ou're going to have to get that deposition transcript. I don't know what kind of court reporter you hired, but that's completely unacceptable.

(ECF 135, at 4-8.) During the status conference, the court also allowed Rogers to renew his request for appointment of counsel. (*Id.* at 8.)

---

[1] The Kansas Department of Corrections moved Rogers to HCF after the attack at EDCF.

On October 22, the court granted Rogers' fourth motion for appointment of counsel. (ECF 100.) The court found that "the landscape of the case [had] changed significantly" since the court had previously denied Rogers' request for counsel. (*Id.* at 1.) The court noted, "Rogers' remaining claim against English has now survived three different dispositive rulings by three different judges, which shows that Rogers' remaining claim has some merit," and that Rogers' transfer to an out-of-state prison "complicated his ability to effectively prepare and prosecute his case at this late stage." (*Id.*) Upon the court's inquiry, Jordan T. Bergsten of the law firm Shook, Hardy & Bacon LLP agreed to represent Rogers on a volunteer basis, and the court appointed him as Rogers' counsel.[2] (ECF 101.)

More than five months after Rogers' July 21 deposition and more than two months after the October 6 status conference during which the court admonished English's counsel to take steps to obtain the deposition transcript, English finally took his first formal step to obtain the deposition transcript. Specifically, English filed an unopposed motion on December 23 in which he sought a court order compelling court reporter Dana Burkdoll ("Burkdoll") of Midwest Reporters, Inc. to produce the transcript. (ECF 106.) The motion stated that English's counsel contacted Burkdoll by email on October 1 to "check the status of the deposition transcript," but Burkdoll did not respond. (*Id.* at 1.) Defense counsel did not reach out to Burkdoll again until December 9. Burkdoll responded that she would "get right back to you with final," but she did not produce the transcript. (*Id.* at 2.) Based on the motion, the court ordered Burkdoll to show cause by January 12, 2022, why the court should not issue an order compelling her to furnish English with the transcript. (ECF 109.) Burkdoll did not respond to the show-cause order, so the court granted English's motion to compel and ordered Burkdoll to provide English with Rogers' deposition transcript by January 27. (ECF 110, at 2.)

---

[2] Two additional members of Shook Hardy & Bacon LLP have since entered appearances for Rogers. (ECF 112, 113.)

3

Apparently Burkdoll did not produce the transcript by the January 27 deadline. English then waited more than another month—until March 4—to file a motion asking the court to order Burkdoll to show cause why she should not be held in contempt of court for her failure to produce the transcript. (ECF 114.) On March 7, the court granted the motion and ordered Burkdoll to appear in person on March 16 to show cause why she should not be found in contempt for failure to comply with the court's January 13 Order. (ECF 115.) On March 15, Burkdoll contacted the presiding district judge's chambers "by telephone and relayed personal and health-related issues that contributed to her delay in producing the transcript." (ECF 119, at 1.) She also emailed a version of the transcript to the court, which the court forwarded to the parties. (*Id.*) Based on that, the district judge found that Burkdoll had "produced the sought-after transcript," and therefore the court was satisfied that she had shown good cause why a contempt citation should not issue. (*Id.*)

On March 22, English renewed his motion for an order to show cause why a contempt citation should not issue to Burkdoll. (ECF 120.) English explained that the transcript Burkdoll provided the court was not complete or accurate. (*Id.* at 2.) He detailed a number of mistakes in the transcript, such as listing the appearance of counsel who were not present at the deposition and incorrectly identifying counsel for various parties. (*Id*. at 2-3.) He also discussed a number of notations on the transcript "cutting out," and noted that at least half of the deposition was missing from the transcript. (*Id*. at 3-4.) Because of this, English asserted that Burkdoll still had not complied with the court's January 13 order to produce Rogers' deposition transcript. Based on this information, the court found that English had demonstrated good cause for the entry of a show cause order and once again ordered Burkdoll to appear in person to show cause why she should not be found in contempt. (ECF 122.)

At that point, Burkdoll retained counsel. (ECF 125.) The court then heard for the first time the COVID-related issues that Burkdoll faced leading up to and on the day of Rogers' deposition. In

a written response to the show cause order (ECF 127) and at the April 11 show-case hearing, Burkdoll (through counsel) relayed the following timeline of events:

- Between December 23, 2020, and June 10, 2021, Burkdoll's father, brother-in-law, and grandmother died as a result of COVID. (*Id.* at 1.)

- On July 20, the day before the deposition, Burkdoll telephoned the Kansas Attorney General's Office ("A.G.'s Office"), which is representing English and which arranged the deposition. According to Burkdoll, she asked if counsel could find a different court reporter for the deposition or if Burkdoll could take the deposition from Topeka over Zoom. Burkdoll said she spoke with a legal assistant named Chelsea Zamora ("Zamora") and that she told Zamora that Burkdoll's ex-husband and children's father was in the intensive care unit of a Topeka hospital, on a ventilator, dying from COVID. (*Id.* at 2.) She further explained that she was exposed to COVID that day when she visited him. (*Id.* at 3.) Zamora refused to consider the request and told Burkdoll to appear in person for the deposition at the correctional facility the next day.

- On July 21, Burkdoll honored this directive and arrived at HCF at 8:45 a.m. She immediately informed the assistant of John Graves ("Graves"), legal counsel for the KDOC at HCF, that she had been exposed to COVID and would like to be dismissed from the job and rescheduled. (*Id.* at 2.) The assistant placed Burkdoll in a conference room by herself.

- At 9:45 a.m., English's counsel arrived at HCF and was told about Burkdoll's COVID exposure. Counsel did not cancel the deposition. Rather, counsel and Graves determined the deposition should go forward with Burkdoll segregated from Rogers and the attorneys. (*Id.*) The deposition began with Burkdoll (and Burkdoll only) participating in the deposition by videoconference.

- During the deposition, Burkdoll's daughters called her to report their father had died, and asked her to return to Topeka. (*Id.* at 3.) Burkdoll asked the parties if the deposition could be stopped and reconvened at another time, "due to the passing of family member of COVID . . . and to return to daughters in Topeka." (ECF 134-1, at 149.) English's counsel continued to ask at least six additional questions, then took time to review her notes, before adjourning the deposition. (*Id.* at 149-152.)

In addition to the COVID-related stress that Burkdoll was under while taking the deposition, she explained that her separation from the deponent and attorneys at HCF caused the transcript to be incomplete and inaccurate. When Graves, with defense counsel's acquiescence, required Burkdoll to participate in the deposition via videoconference, Burkdoll logged into the conference using her personal "hot spot" cellular connection. However, the videoconference capabilities at HCF were lacking, causing connectivity problems, of which counsel were aware. The transcript of the

5

deposition reflects that at the start of the deposition—immediately after counsel entered their appearances—there was a discussion about the "videoconference line being unsteady at [HCF]." (ECF 134-1, at 7; *see also* ECF 127, at 3.) Despite knowing the connection was unsteady—not to mention the highly unusual arrangement where the court reporter was segregated from the attorney taking the deposition and the deponent, who were both live in a separate room—English's counsel did not postpone the deposition to a date when the court reporter could be present in the same room. The deposition proceeded.

Not long after the start, Burkdoll requested a break to be updated on her ex-husband's condition. (ECF 134-1, at 35.) When the parties went back on the record, the videoconference was again "unstable" and had to be fixed. (*Id.*) Although the exact timing is unclear, it appears that about 30 minutes into the deposition, the videoconference connection was lost and the deposition again paused. (*Id.* at 63.) English's counsel represented at the show-cause hearing that, around this time in the deposition, she was told by prison staff that Burkdoll was no longer inside HCF and was transcribing from her car. Still, English's counsel did not stop the deposition upon learning this news.

From that point forward, a consistent and ongoing pattern developed of the connection being lost. (*See e.g.*, *id.* at 85, 106, 113, 139.) At some point during the deposition, the parties agreed to have Burkdoll connect by audio only, but the audio connection also was unclear and there was significant background noise. At no time during these connection problems did English's counsel ask to adjourn and reschedule the deposition. Indeed, the "deposition actually lasted several hours." (ECF 134, at 4.)

After the deposition, Burkdoll experienced health problems that delayed her preparation of the deposition transcript. (ECF 127, at 4.) But on April 6, before the show-cause hearing, Burkdoll did provide the parties with an updated, "final" version of the transcript. (ECF 134, at 2; 134-1.) Though still not complete, Burkdoll represented that the final version was the best possible transcript

6

she could produce "under the circumstances." (ECF 134-1, at 153; ECF 127, at 4.) She also provided English the audio recording of 31 minutes of the deposition. (ECF 130, at 2; 134, at 3.) Based on this record, the court found that no contempt citation should be issued. (ECF 130, at 1.)

There is no dispute that the final version of the transcript produced is incomplete and inaccurate. (ECF 130, at 1; 134, at 2.) For example, English represents that "[a]lmost every topic is missing portions of dialogue" and that fewer than half of the exhibits his counsel used were identified and attached to the transcript. (ECF 134, at 3.) There are numerous instances throughout the transcript in which "--" is inserted instead of dialogue. (ECF 134-1.) Deeming the transcript and audio recording Burkdoll produced to be "so incomplete and inaccurate that they are worthless," English moves the court to grant him leave to depose Rogers a second time. (ECF 134, at 5.) Rogers opposes sitting for a second deposition.

## II.  LEGAL STANDARDS

Federal Rule of Civil Procedure 30(a) presumptively limits a party to deposing a witness a single time. A party may exceed this limit only by stipulation or with the court's leave. *See* FED. R. CIV. P. 30(a)(2).[3] In determining whether to grant leave, the court must consider the standards set forth in Federal Rule of Civil Procedure 26(b)(1) and (2). *Id.* ("[T]he court must grant leave to the extent consistent with Rule 26(b)(1) and (2) . . . ."). Ultimately, "[t]he propriety of deposing someone a second time addresses the discretion of the court." *Cuthbertson v. Excel Indus., Inc.,* 179 F.R.D. 599, 604 (D. Kan. 1998) (denying leave for a second deposition).

Rule 26(b)(1) defines the scope of discovery. Under the rule, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional

---

[3] Parties also must obtain leave of court to depose a person confined in prison. FED. R. CIV. P. 30(a)(2)(B). Rogers is incarcerated, and the court granted English leave to depose him. (ECF 48, at 2.)

7

to the needs of the case." FED. R. CIV. P. 26(b)(1). In other words, considerations of both relevance and proportionality expressly govern the scope of discovery. Relevance is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). In evaluating proportionality, the court considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. P. 26(b)(1).

Rule 26(b)(2) sets forth when a court is permitted or required to limit discovery. The court "*must* limit the frequency or extent of discovery" when

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
> (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

FED. R. CIV. P. 26(b)(2)(C) (emphasis added).

## III. ENGLISH HAD AMPLE OPPORTUNITY TO OBTAIN THE INFORMATION HE NOW SEEKS

In deciding whether to grant English leave to re-depose Rogers, the court begins its analysis with Rule 26(b)(2)(C). As mentioned, this rule requires the court to deny the request when "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action." FED. R. CIV. P. 26(b)(2)(C)(ii). English does not specifically state what testimony he hopes to obtain from Rogers. Rather, he makes the conclusory statement that Rogers' testimony "is crucial to the claims and defenses in this action." (ECF 134, at 5.) Regardless of the specific information English seeks through a second deposition, the record is clear that he already had ample opportunity to seek all relevant information from Rogers in discovery.

To begin, the court gave English an opportunity to depose Rogers and to obtain a clear and useable transcript of the same. Rogers willingly sat for a deposition last July. Although he states it was traumatic for him to talk about the attacks on him, Rogers never objected or refused to answer questions posed by defense counsel. Rather, the mess of the current deposition transcript is wholly the responsibility of the A.G.'s Office. To be sure, the court certainly recognizes that Burkdoll did not fulfill her court reporting obligations by producing a complete and accurate deposition transcript. But expecting her to do so was unrealistic under the circumstances. Given the multiple warning signs discussed below, the A.G.'s Office should have seen this train wreck coming and gotten off the tracks.

First, Burkdoll telephoned the A.G.'s Office the day before the deposition and asked to be taken off the deposition or allowed to participate from Topeka (and a presumably stable wi-fi connection). At the show-cause hearing, English's counsel disputed that Burkdoll told Zamora that her ex-husband and children's father was in a hospital dying from COVID and also that Burkdoll told Zamora that Burkdoll was exposed to COVID that day when she visited him. As between Burkdoll's representation and English's counsel's representation, the court finds Burkdoll's representation to be more persuasive because nothing in the record suggests that English's counsel was present during the conversation between Burkdoll and Zamora. Moreover, English's counsel did not bring Zamora herself to the hearing or otherwise submit any firsthand representation from Zamora to dispute Burkdoll's earlier-submitted written account. Based on this record, the court can most charitably reconcile the parties' competing representations by concluding that English's counsel must have been left in the dark about the full substance of the conversation between Burkdoll and Zamora. Consequently, the court credits Burkdoll's representation that the A.G.'s Office had fair notice the day before the deposition about Burkdoll's COVID-related complications.

It is undisputed that Zamora denied Burkdoll's request to find an alternate court reporter and told Burkdoll to appear in person at the deposition. English now tries to justify this harsh response

9

by explaining that Midwest Reporters, Inc. was the only court-reporting agency with whom the A.G.'s Office contracted. (ECF 139, at 2.) But that excuse simply reflects another poor decision by the state and the A.G.'s Office. There are dozens and perhaps hundreds of court reporters in the area. The A.G.'s Office should have arranged for a different court reporter to cover the deposition. Alternatively, the A.G.'s Office could have arranged for all participants (including Burkdoll) to have had the same technological access, whether via videoconference or telephone. Or the A.G.'s Office could have postponed the deposition to another day. But the A.G.'s Office did none of these things.

When English's counsel arrived at HCF the next day, she was immediately told that Burkdoll had been exposed to COVID and would not be able to transcribe from the same room as the deponent. Even if English's counsel did not know about the conversation between Zamora and Burkdoll the day prior, at that point she knew about the unusual circumstances—both Burkdoll's COVID concerns and the segregation of the court reporter. This should have led to counsel postponing the deposition. But she did not. Instead, she plowed forward with it. Having done so, it was incumbent on English's counsel to ensure that the court reporter was setup so that she could generate an accurate transcript. Yet English's counsel was given multiple warnings that this was not happening. Just minutes after the deposition began, the videoconference line that connected the deposition room with the court reporter became "unsteady." (ECF 134-1, at 7.) The videoconference connection thereafter was lost multiple times and the deposition paused as a result. Rather than postpone the remainder of the deposition, Burkdoll was allowed to connect by audio only. This was a precarious choice for an attorney seeking a clean record. At some point during the deposition, English's counsel learned that Burkdoll was attempting to connect to the deposition and transcribe from her vehicle. Although this should have been another red flag that an accurate record was not being taken, again counsel did not temporarily adjourn the deposition. Astoundingly, counsel did not even stop the deposition when the

court reporter specifically asked if it could be stopped and reconvened at a later time because her family member had just died and she needed to return to her grieving daughters.

Ultimately, it was entirely within English's counsel's control to obtain a clean and accurate transcript of Rogers' deposition.  Any attorney who actually wanted a clean deposition transcript would have made alternative arrangements—such as by hiring a different court reporter in advance or by rescheduling the deposition when (multiple) problems arose.  But a series of bad decisions led to a bad record.  The COVID pandemic led litigants to transition more heavily to new technologies for depositions like videoconferencing, and that is commendable.  But Rogers' deposition occurred more than a year into the pandemic when attorneys had largely adapted to these new technologies and understood their limitations, like connectivity problems and other glitches.  Knowing this, English's counsel rolled the dice by forging ahead with taking the deposition live while relegating Burkdoll to subpar participation where she did not have equal access to hear what was said.  Any responsible attorney would recognize that these circumstances would compromise the extent to which a court reporter would be able to generate a complete and accurate transcript.

Additionally, English had ample opportunity to obtain through written discovery whatever relevant information he now seeks from Rogers.  The KDOC has already produced a report pursuant to *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978) ("*Martinez* report"), that reflects most of the basic facts surrounding the incident.  And the docket sheet reflects that English served Rogers with requests for production of documents and interrogatories on August 16, 2021.  (ECF 88.)  Moreover, discovery did not end until April 28.  (ECF 105, at 1.)  English was certainly on notice well before that deadline that there was a problem with Rogers' deposition transcript.  English notified the court in October 2021 about Burkdoll's failure to provide the transcript.  While English did not receive a copy of the deficient transcript until March—due to his own serial, unexplained, months-long delays

11

in moving to compel production of the transcript—he still had time to serve follow-up written discovery to fill in any gaps in the transcript.

For all of these reasons, the court finds that English had ample opportunity to obtain Rogers' testimony about the claims and defenses in this case via the *Martinez* report, by taking measures to make sure that his first deposition could be adequately transcribed, or by serving written discovery. Thus, re-deposing Rogers is not permitted by Rule 26(b)(2)(C)(ii), and the court denies English's motion on this basis.

### IV. PERMITTING A SECOND DEPOSITION IS NOT PROPORTIONAL TO THE NEEDS OF THE CASE

Rule 26(b)(1) also leads the court to deny English's request to compel Rogers to sit for a second deposition. As mentioned above, this rule directs the court to consider factors of both relevance and proportionality. Given the broad construction of relevance at the discovery stage, *Oppenheimer Fund*, 437 U.S. at 351, the court has little difficulty finding testimony of the only plaintiff in this case to be at least marginally relevant. However, the court again notes that English does not specifically state what information he hopes to obtain from Rogers that he has not already had the opportunity to obtain.

The court reaches a different conclusion after applying the proportionality factors. Rule 26(b)(1) directs the court to consider (1) the importance of the issues at stake in the action, (2) the amount in controversy, (3) the parties' relative access to relevant information, (4) the parties' resources, (5) the importance of discovery in resolving issues in the case, and (6) whether the burden or expense of the proposed discovery outweighs its likely benefit. After weighing these factors below, the court finds that, on balance, English has not demonstrated that a second deposition is proportional to the needs of this case.

Importance of the Issues at Stake in the Action

"[T]he first proportionality factor looks at whether the issues at stake implicate broader 'public policy spheres, such as employment practices, free speech, and other matters [that] may have importance far beyond the monetary amount involved,' or if the claims seek to 'vindicate vitally important personal or public values.'" *Lawson v. Spirit AeroSystems, Inc.,* No. 18-1100-EFM-ADM, 2020 WL 3288058, at *11 (D. Kan. June 18, 2020) (quoting FED. R. CIV. P. 26(b)(1) advisory committee notes to the 2015 amendments and citing *Nyberg v. Zurich Am. Ins. Co*., No. 15-1359-EFM, 2016 WL 11671468, at *3 (D. Kan. June 21, 2016)). Because this case involves Rogers' constitutional right to humane conditions of confinement, this factor technically favors allowing the discovery. *See Cratty v. City of Wyandotte*, 296 F. Supp. 3d 854, 860 (E.D. Mich. 2017) (finding this factor weighs in favor of discovery where constitutional rights are at stake). However, the court attributes little weight to this factor given that, as discussed below, English has not articulated how re-deposing Rogers will help resolve any such important issues.

The Amount in Controversy

In evaluating the next proportionality factor, courts compare the cost of the discovery at issue to the amount in controversy. *Lawson*, 2020 WL 3288058, at *11. The Pretrial Order indicates Rogers seeks approximately $50,000 in compensatory damages and at least $200,000 in punitive damages. Although no party estimates the costs involved in re-deposing Rogers, including counsel's cost to travel to Arizona where he is now confined, such costs are unlikely to approach the amount of damages sought. The court has also considered the possibility of reducing the costs associated with re-deposing Rogers even further by allowing the second deposition to be taken by videoconference. But, as a practical matter, his counsel would probably want to be present (and would be entitled to be present) in order to effectively prepare for and defend such an important deposition. Regardless, this factor weighs in English's favor. The court is mindful, however, that "'monetary stakes are only one

13

factor' that must be balanced against the other proportionality factors." *Id.* at *12 (quoting FED. R. CIV. P. 26(b)(1) advisory committee notes to the 2015 amendment).

### The Parties' Relative Access to Relevant Information

The court turns next to the parties' relative access to relevant information. "In considering this factor, courts look for 'information asymmetry'—a circumstance in which one party has very little discoverable information while the other party has vast amounts of discoverable information." *Id.* (quoting *Oxbow Carbon & Minerals, LLC v. Union Pac. R.R. Co.*, 322 F.R.D. 1, 8 (D.D.C. 2017), which in turn quoted FED. R. CIV. P. 26(b)(1) advisory committee notes to the 2015 amendment)). "[T]he burden of responding to discovery lies heavier on the party who has more information, and properly so." FED. R. CIV. P. 26(b)(1) advisory committee notes to the 2015 amendment.

There is no doubt that English, through his employer the KDOC, has access to vast amounts of information surrounding Rogers' claims. The KDOC has generated a *Martinez* report that is 212 pages in length and includes a tape-recorded interview of Rogers after the attack, a video of the attack, and numerous records such as incident reports and inmate movement logs. (ECF 23.) English has not had any difficulty formulating his defenses or articulating his positions in the Pretrial Order. It also bears repeating that English had full access to all the information he might gain from re-deposing Rogers when he deposed him the first time. The fact that the transcript from the first deposition is unusable is attributable to the actions of the A.G.'s Office, as discussed above. Rogers, on the other hand, is an inmate with more limited access to the relevant information (such as transfer documentation, prison procedures, and grievance forms) at the heart of his case. *See Schuh v. Clayton*, No. 20-10468, 2021 WL 3489695, at *3 (E.D. Mich. Aug. 9, 2021) ("[I]t seems evident that as a *pro se* prisoner, Plaintiff does not have the same access to information or resources as the [detention center medical provider] Defendants."). This factor weighs in Rogers' favor.

<u>The Parties' Resources</u>

The fourth proportionality consideration is the parties' relative resources.  Here, English is defended by his employer, the KDOC as represented by the A.G.'s Office, which is an arm of the state.  By contrast, Rogers is indigent and represented by court-appointed counsel.  If the court were to allow a second deposition, his volunteer counsel would incur travel expenses to attend the deposition in Arizona, not to mention forego valuable time that could be spent on other, paying cases.  One point the court wishes to emphasize—defense counsel did not make any apparent efforts for more than two months to secure the deposition transcript, waiting until *after* Rogers was transferred to Arizona to first raise the issue with the court.  If defense counsel had been more diligent in attempting to obtain the transcript of the first deposition from Burkdoll, they would have learned of the inaccuracies before Rogers' transfer to Arizona and a second deposition would be less costly.  But, as things currently stand, there is no question that re-deposing Rogers at this juncture would come at a significant cost.  Because KDOC's resources far outweigh those of Rogers, this factor weighs against allowing a second deposition.

<u>The Importance of the Discovery in Resolving the Issues</u>

Next, the court considers whether the discovery sought is important to resolution of issues in the case.  "In analyzing the importance of the discovery in resolving the issues in the case, the court looks to whether the discovery seeks information on issues 'at the very heart of [the] litigation.'" *Lawson*, 2020 WL 3288058, at *14-15 (quoting *Oxbow Carbon*, 322 F.R.D. at 8 (alteration in original)).  "A party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them."  FED. R. CIV. P. 26(b)(1) advisory committee notes to the 2015 amendment.

Here, this factor weighs heavily in Rogers' favor because English has not identified the "underlying information" he seeks, let alone "explain[ed] the ways in which the underlying

information bears on the issues."  As noted above, English does not state why he believes it is important to re-depose Rogers.  He does not articulate what information he seeks or offer any cogent explanation as to why that information cannot be found in other discovery in the case or in the well-developed *Martinez* report prepared by the KDOC.  The only explanation English offers in his motion is a conclusory argument that Rogers' testimony is "crucial to the claims and defenses in this action." (ECF 134, at 5.)  English does not elaborate on this in any way.  Given that KDOC was able to generate a detailed *Martinez* report and that English had no known trouble formulating his factual contentions and legal defenses in the Pretrial Order, as well as the fact that English has not identified *any* gaps in discovery that he seeks to fill with a second deposition, this factor weighs against granting leave for a second deposition.  *See Akbar v. Bangash*, No. 15-CV-12688, 2018 WL 11351991, at *6 (E.D. Mich. Aug. 16, 2018) (applying proportionality factors and denying motion to re-depose plaintiffs where movant did not "articulate[] an alleged gap in the evidence that they need the depositions to fill"); *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, No. 09-CV-00970-PAB-KMT, 2014 WL 358866, at *1 (D. Colo. Jan. 31, 2014) (denying leave for a second deposition where movant failed to show "need or good reason" for the request).

<u>Whether the Burden or Expense of the Discovery Outweighs its Likely Benefit</u>

The final proportionality consideration is whether the burden or expense of conducting the remaining discovery outweighs its likely benefit.  This factor encompasses much of what has already been discussed.  Because English has not articulated any benefit at all of re-deposing Rogers, and certainly has not addressed what gaps in discovery he hopes to fill, the "benefit" side of the scale essentially bears no weight.  *See L.S. v. Oliver*, No. 19CV746-JLS-LL, 2019 WL 4849174, at *4 (S.D. Cal. Oct. 1, 2019) (holding that requiring party to appear for a second deposition would be duplicative of documents in movant's possession and therefore "not proportional to the needs of the case").

The "expense/burden" side of the scale, on the other hand, is significant for both Rogers and his volunteer counsel. Rogers states that sitting for a second deposition will force him "to once again relive traumatic events." (ECF 136, at 5.) Indeed, the first deposition involved several hours of defense counsel asking Rogers questions about attacks that left him hospitalized in 2017 and 2019. Additionally, as noted, Rogers is now located in Arizona, such that his Kansas City counsel would incur the time and expense of travel if a second deposition were allowed. Such time would "take time from trial preparation." (ECF 136, at 2.) Rogers also asserts he would be disadvantaged by his counsel having to "adjust trial strategy well after the close of fact discovery." (*Id.*)

The court finds this proportionality factor to be the most significant in the instant case. Weighing the high burden Rogers would face if re-deposed against the unspecified and unclear benefit English would obtain from a second deposition, the court can find no good reason to allow this discovery.

In short, the court finds that while the first two proportionality factors fall on the side of granting English's request, the remaining factors fall heavily on the side of protecting Rogers from a second deposition. Thus, re-deposing Rogers is disproportionate to the needs of the case under Rule 26(b)(1). The court therefore denies English's motion on this basis, as well.

## V.   CONCLUSION

The court recognizes that English may have a more difficult task cross-examining Rogers at trial without re-deposing him.[4] (*See* ECF 139, at 1.) To be sure, the parties agree the transcript of the first deposition is so incomplete and inaccurate as to be "worthless" (ECF 134, at 5) and "unusable" (ECF 139, at 4). (*See also* ECF 136, at 4 ("Burkdoll produced a transcript that was not a

---

[4] The court hardly believes, however, that proceeding to trial without the transcript of a witness's deposition is as impossible as English suggests. (ECF 139, at 2.) Such a situation does not happen infrequently.

true and accurate record of Plaintiff's deposition transcript, but rather the best she could recreate.").) Burkdoll took the unusual step of not fully certifying the transcript under Federal Rule of Civil Procedure 30(f)(1). Nonetheless, English has not demonstrated that he did not have an opportunity to obtain the information he now seeks via Rogers' first deposition if English's counsel had exercised caution in ensuring that the court reporter was setup so that she could generate a complete and accurate transcript. Nor has English demonstrated that re-deposing Rogers is proportional to the needs of the case. Accordingly, the court denies English's request for leave to re-depose Rogers.

**IT IS THEREFORE ORDERED** that English's Motion to Depose Plaintiff a Second Time (ECF 134) is denied.

**IT IS SO ORDERED.**

Dated June 24, 2022, at Kansas City, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge