# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MICHAEL W. ROGERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | Case No.: 19-3145-JAR-ADM |
| RICHARD ENGLISH, ) | |
| ) | |
| Defendant.[1] ) | |
| ) | |

## PRETRIAL ORDER

U.S. Magistrate Judge Angel D. Mitchell conducted a pretrial conference in this case on May 26 by phone, which the court reconvened on June 13 by videoconference and again on June 24 by phone. Plaintiff Michael W. Rogers ("Rogers") appeared through counsel Jordan Bergsten, William Walberg, and Bobbi Sell. Defendant Richard English ("English") appeared through counsel Natasha Carter and Shon Qualseth.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the Court's approval, or by order of the court to prevent manifest injustice. *See* FED. R. CIV. P. 16(d) & (e); D. KAN. RULE 16.2(b).

**1.    PRELIMINARY MATTERS.**

   **a)    Subject-Matter Jurisdiction.**  Subject-matter jurisdiction is invoked under 28 U.S.C. § 1331 and is not disputed.

   **b)    Personal Jurisdiction.**  The court's personal jurisdiction over the parties is not disputed.

---

[1] Rogers' complaint also named Warden Sam Cline and Special Agent Brett Sissell as defendants, but the court dismissed Rogers' claims against those defendants. (ECF 47, 89.)

    **c)**    **Venue.**  Venue in this court is not disputed.

    **d)**    **Governing Law.**  Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by U.S. CONST. AMEND. VIII pursuant to 42 U.S.C. § 1983, *et seq*.

**2.**    **STIPULATIONS.**

    **a)**    The parties stipulate to the following facts:

    i.    On January 23, 2017, Rogers arrived at the Kansas Department of Corrections ("KDOC") on interstate compact from the State of Florida.

    ii.    Rogers was initially housed in El Dorado Correctional Facility ("EDCF") for evaluation in the Reception and Diagnostic Unit.

    iii.    Rogers was then transferred to the Hutchinson Correctional Facility ("HCF").  He remained at HCF for approximately five months before he was transferred back to EDCF on July 19, 2017.

    iv.    On August 22, 2017, Rogers was placed on Low/Medium Custody by Exception and transferred to Norton Correctional Facility ("NCF").

    v.    In February 2018, Rogers returned to EDCF.  He requested and was granted Protective Custody status.  He was placed in Cellhouse E-1.

    vi.    English was a Unit Team Manager ("UTM") at EDCF at the time, but Rogers was not placed under English's supervision until Rogers was moved to Cellhouse E-1 in 2018.

    vii.    In April 2018, Cellhouse E-1 was converted to an experimental housing unit called Managed Movement Unit ("MMU").

    viii.    On May 9, 2018, Rogers signed an "Acknowledgement & Release from Protective Custody" form to become part of MMU that stated as follows:

> I, Rogers, Michael #115224, Cell E-1-218, Detail Assignment Protective custody, have on the 9th day of May, 2018 request of my own free will not to be placed in Administrative Segregation on Protective Custody Status or have requested to be released from Protective Custody Status.  I have full knowledge of the potential consequences of this action.  However, at this time I do not believe I would be in any danger in the General Population. Pursuant to KAR 44/14/302 (a) I further understand and have been made aware that should I need protective custody in the future, I may request it at any time.  I hereby release and hold harmless the State of Kansas,

        Department of Corrections, El Dorado Correctional Facility, their officers, and employees of any liability, which might result from my decision to voluntarily, relinquish Protective Custody Status. Offender is signing this PC Waiver to become part of the E1CH Manage Movement Unit. Offender will not be returned to the General Population Unit until they are ready to progress to a General Population setting at a facility within the state of Kansas appropriate for his custody level.

  ix.  Rogers was housed in the MMU from May 23 to August 22, 2018; again from August 31 to December 6, 2018; and then again from January 31, 2019, until the MMU was disbanded on June 25, 2019.

  x.  While Rogers was housed in the MMU, English was the Unit Team Manager. In addition to English, other staff in the MMU at the time were Unit Team Supervisors Buchanan and Todd. There was also a shift major, and a shift captain.

  xi.  On June 25, 2019, the MMU was disbanded and E1 Cellhouse reverted to a traditional general population housing unit. Rogers remained in E1 Cellhouse until July 7, 2019.

  xii.  English remained a UTM at E1 Cellhouse until at least July 7, 2019.

  xiii.  On July 7, Rogers was transferred to A Cellhouse, where he was placed in segregation until July 11.

  xiv.  English was not the Unit Team Manager for A Cellhouse.

  xv.  On July 11, Rogers moved out of segregation to a new cellhouse, D Cellhouse, which was a general population unit. English was not the Unit Team Manager for D Cellhouse.

  xvi.  On July 19, Rogers left D Cellhouse to go to E Cellhouse, which was a general population unit. While Rogers was in E Cellhouse, he was stabbed by multiple offenders several times. His injuries resulted in a three-day hospital stay.

**b)**  The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment and trial:

  i.  EDCF map (ECF 23-7)

  ii.  English's responses to Rogers' interrogatories

  iii.  Rogers' interrogatory responses

        iv.      May 9, 2018, Acknowledgement and Release Form (ECF 23-5, Exhibit E-2 to *Martinez* Report)

        v.      2005-11-01 KDOC Inmate Custody Classification Manual

The parties agree to meet and confer regarding additional stipulations of facts and exhibits to streamline the presentation of evidence at trial. The parties will file any additional stipulations 10 days prior to trial.

**3.**     **FACTUAL CONTENTIONS.**

    **a)**     **Rogers' Factual Contentions.**

By 2017, all KDOC employees[2] responsible for supervising and managing Rogers were on notice that Rogers was in mortal danger from a particular threat group at KDOC ("the Group"), and that Rogers would be injured, attacked, or killed if he were ever housed in general population accessible by members of that Group.

In January 2017, KDOC agreed to accept Rogers from another jurisdiction that was trying to move Rogers out of their system "for the inmate's protection." On June 23, 2017, Rogers told his team at HCF that he was concerned about his safety. He told his Unit Team that he believed an inmate had obtained information about the reason Rogers was transferred to KDOC (which was supposed to have been kept confidential), that the inmate had spread that information to another security threat group, and that Rogers was in danger.

On July 21, 2017, Rogers spoke with a UTM at EDCF and explained that he needed protection because of the issues he had with another inmate and that same Group at HCF. That same day around 10:00 p.m., Rogers was attacked in the EDCF dayroom in G Cellhouse by two

---

[2] English objects to Rogers' contentions about the knowledge of other KDOC employees when English is the only defendant in this case. This objection is overruled because this portion of the pretrial order is Rogers' opportunity to set forth the factual contentions he believes will support his claims on the merits. The court will therefore include these contentions in the pretrial order while preserving English's right to lodge objections to the admissibility of such evidence at trial.

offenders. Rogers could not determine for certain who his attackers were, but he believed and reported that it had been sanctioned by that same Group. KDOC confirmed that the 2017 attackers were affiliated with and validated members of that Group. Rogers was treated for his injuries at the hospital and released back to EDCF on July 22, 2017.

Because of this attack, Rogers was placed in restrictive housing under Hold Over status for his safety and security until he could be transferred to NCF. As a result, Rogers was placed in segregation at HCF until he was transferred to EDCF on July 19, 2017. KDOC could not determine if it was safe for Rogers to remain at EDCF, so he was placed on Low/Medium Custody by Exception and transferred to NCF on August 22, 2017. He remained there for approximately six months.

In February 2018, Rogers was transferred back to EDCF. After returning to EDCF, members of that Group approached Rogers on February 6, 2018, and told him he would be killed if he did not leave the yard. Rogers reported this to staff and was placed under Protective Custody status. Rogers was moved to B Cellhouse until March 16, 2018, when he was moved to E Cellhouse, which was also on "Protection for Other Offenders" status.

In April 2018, E Cellhouse was converted to an experimental housing unit that would allow offenders who qualified for protective custody to be housed there with additional privileges similar to general population. This unit was known as "PC Lite" or MMU. At this point, Rogers was separated from members of that Group in the general population who wished to harm him. All KDOC employees, including English, were on notice of ongoing threats to Rogers' life by members of that Group if Rogers ever returned to general population with members of that Group present.

When Rogers was moved to the MMU/PC Lite unit in E Cellhouse, KDOC gave him a written promise[3] stating he would not be moved back to general population until he was "ready." KDOC never rescinded this promise, and Rogers reasonably relied on it, including by signing forms that were labeled waivers but that Rogers was told and understood would merely mean that he would get to continue to enjoy the protections and privileges of the MMU/PC Lite unit, while maintaining separation from general population inmates.

When Rogers was told that E Cellhouse would be returning to a traditional general population unit, he did not consent to remaining in E Cellhouse.[4] Instead, he voiced his concern that his life would be in danger if he were placed in a general population unit. English admitted in his deposition that, at the time the MMU was disbanded, no inmate should have been moved from the MMU to a traditional general population unit without receiving an additional waiver acknowledging that this was occurring and that the inmate felt safe going into general population at that time.

---

[3] English objects to Rogers' contention regarding a promise by KDOC given that Rogers signed a waiver of protective custody to enter the MMU, and the language of that waiver speaks for itself. For essentially the same reasons set forth in footnote 2, *supra*, the court overrules this objection and includes this contention in the pretrial order while preserving English's right to lodge objections to the admissibility of such evidence at trial.

[4] English objects to this contention on the grounds that it somehow contradicts Rogers' sworn statements submitted to this court in response to defendants' motions to dismiss. This objection is overruled at this procedural juncture because the court is unable to ascertain any material contradictions. As to the first clause, whether Rogers knew that E Cellhouse would be returning to a general population unit is not particularly material. As to the second clause, the characterization that Rogers "*did not consent* to remaining in E Cellhouse" (emphasis added) does not appear to contradict the record the court relied on in denying English qualified immunity. (ECF 47, at 10, 12-14, 21-23, 25-26, 30, 32 ("Rogers contends that he never indicated any intent or consent to reside in general population …."); ECF 89, at 10.) The court will therefore include this contention in the pretrial order while preserving English's right to lodge objections to such evidence at trial.

Before Rogers was moved to a traditional general population unit with the disbandment of the MMU, Special Agent Brett Sissell ("Sissell") wanted to talk to Rogers because Sissell was concerned about Rogers' safety due to the 2017 attack on Rogers by that same Group. English admitted that Rogers should not have been moved from the MMU to a general population unit without signoff from Sissell or someone else in the Enforcement, Apprehensions, and Investigations ("EAI") department to which Sissell belonged. Although Sissell requested the opportunity to talk to Rogers about this issue before Rogers was moved from the MMU to a general population unit, no such conversation occurred. Rogers was nonetheless moved to a general population unit.

At all times when English supervised Rogers, English knew or should have known[5] about these 2017 and 2018 incidents, and the ongoing danger that Group posed to Rogers. English could have avoided learning of such facts only by recklessly disregarding Rogers' safety.

On the night Rogers was attacked in E Cellhouse in July 2019, Officer Eberhardt gave Rogers permission to leave D Cellhouse to get his laundry from E Cellhouse. Rogers also was addressed by guards at E Cellhouse upon entering, explained his purpose, and was allowed to stay. While Rogers was in the laundry facility, he was attacked by multiple offenders and stabbed ten times in the back, head, arm, leg, and chest with an "ice pick style" weapon. The three assailants were ordered to do so by leaders of that same Group, and they were attempting to kill Rogers. This attack on Rogers led to a three-day hospital stay, with Rogers suffering a collapsed lung, punctured

---

[5] English objects to Rogers including this "should have known" language on the grounds that it misstates the applicable legal standard and would mislead the jury. Again, for essentially the same reasons set forth in footnotes 2 and 3, *supra*, the court overrules this objection and includes this contention in the pretrial order while preserving English's right to lodge objections to the admissibility of such evidence and argument at trial.

kidney, lifetime PTSD, seizures, other neurological problems, and an intense fear of being in groups that will forever affect his ability to hold traditional jobs.[6]

### b) English's Factual Contentions.

On July 19, 2019, English acted reasonably and did not disregard a known risk to Rogers' safety. English is responsible only for his own knowledge and his own actions. He did not supervise Rogers in 2017 or at HCF. English had personal knowledge only of events that occurred during English's supervision of Rogers, which did not begin until shortly before the MMU was created on or about May 23, 2018. In order for Rogers to enter the MMU, he signed a waiver of protective custody. The MMU was a temporary experimental housing unit that allowed offenders who qualified for protective custody to be housed with additional privileges similar to general population to see if these inmates could successfully transition into general population. The MMU housed inmates that did and did not qualify for protective custody. Rogers reported no safety concerns about other MMU inmates while under English's supervision in the MMU. Rogers was not injured while in the MMU. Rogers acted as a porter while in the MMU and moved freely among the MMU inmates, including inmates with ties to the Group. When English and Rogers interacted in the MMU, Rogers was inconsistent about whether he still had safety concerns about returning to general population in the future.

Ultimately, KDOC decided to close the MMU. About a month before it closed, all MMU inmates, including Rogers, were notified about this and told they would have to decide to go either to protective custody or to general population when the MMU closed on June 25, 2019. Because

---

[6] English objects to Rogers including this language to the extent that these conditions are not supported by the discovery record or admissible evidence. This objection is overruled for essentially the same reasons set forth in footnotes 2, 3, and 5, *supra*. English may lodge objections to the admissibility of such evidence at trial.

all MMU inmates signed a written waiver of protective custody when they entered the MMU, no second waiver was required by KDOC policy when the MMU closed. Rogers acknowledged that he had that choice to make—a choice that included an offer of protective custody. Many other MMU inmates chose to go to protective custody when the MMU closed. After the notification was sent out, Rogers told English he wanted to go to general population. Rogers said he was not afraid of anyone in general population. At the time the MMU was closing, English did not know about any threat to Rogers' safety at EDCF.

The EAI Unit has knowledge about gang affiliations, activities, and threats that English did not have. According to EAI, the threat situation in any KDOC facility is subject to change and is not a static situation. English reached out to EAI to see if there were any objections to Rogers' request to go to general population. English also notified his supervisor, Maria Bos, about the request. KDOC policy did not require signoff from EAI, and English did not receive any objection from EAI or Bos. English did not know of any reason to deny Rogers' request to go to general population when the MMU closed on June 25, 2019.

If Rogers changed his mind about going to general population, he had ample opportunity to say so, including on and after June 25, 2019, but he did not. Rogers had access to grievance procedures the entire time he was in KDOC custody. Rogers was knowledgeable about Form 9 procedures and the four-step grievance process. Yet, Rogers did not file a Form 9 with a specific request for protective custody. Rogers also did not refuse to go into general population when the MMU closed. If Rogers was concerned about his safety, there were several KDOC staff (in addition to English) he could have asked for protective custody. For example, he could have asked Unit Team Supervisors Buchanan and Todd, a shift major, a shift captain, or an EAI member such as Sissell. But Rogers did not make a request for protective custody to anyone.

Rogers did not like being in protective custody. It is very restrictive. Protective custody inmates are in their cells up to 23 hours a day, leaving only under restraint and for limited purposes. Rogers asked numerous times to go to general population at EDCF. Rogers also requested to go to NCF or possibly Ellsworth, but his custody level did not qualify him for those facilities. When KDOC made an exception to allow him to go to NCF, he got kicked out of NCF for disciplinary reasons, including breaking into an evidence room. English's authority to transfer inmates was limited to his own cellhouse.

On July 19, 2019, English was no longer supervising Rogers because he had moved to another D Cellhouse, which was under a different UTM. While Rogers was housed in D Cellhouse, he asked to be transferred to E Cellhouse. When Rogers was stabbed, he was not in his assigned cellhouse and he was in an area he was not supposed to be. On that day, Rogers chose to put himself at risk.

Rogers' damage claims are unsupported by evidence or the discovery record. As to claims of lost income, Rogers has presented no documents in support of the lost income claims. Notably, to the extent that Rogers could work while he was in protective custody, the wage was minimal, not minimum wage. Rogers did not designate an expert to testify that he has any "ongoing" health issues attributable to the July 2019 incident, including his claim that he has seizures—a claim that was not presented or diagnosed while he was in KDOC custody. And to the extent that Rogers is seeking damages for medical expenses while he was in KDOC custody, KDOC already paid those expenses.

4.   **LEGAL CLAIMS AND DEFENSES.**

   a)   **Plaintiff Rogers' Claims.**

Rogers asserts he is entitled to recover upon the following theory:

      i.    English violated Rogers' Eighth Amendment right by failing to provide humane conditions of confinement, which requires reasonable measures to guarantee inmate safety.  Rogers demonstrated to English a substantial risk of serious harm; English had actual knowledge of this security risk; English acted with deliberate indifference to Rogers' safety; and English's response was unreasonable.  English demonstrated reckless or callous indifference to Rogers' federally protected rights.

**b)**     **English's Defenses.**

English asserts the following defenses:

      i.    English disputes the nature and extent of Rogers' alleged damages and any damages not adequately disclosed in discovery.  For example, Rogers' claim for $24,770 in lost wages is not supported by any evidence.  For one thing, Rogers only ceased working for a short period of time after the July 2019 incident.  The $24,770 sum is also based on the assumption that he would have been working for minimum wage, but he never made that much while in KDOC custody for reasons such as that he was not eligible for minimum wage jobs or was in segregation and could not work.  Furthermore, Rogers' medical records do not reveal any evidence of ongoing seizures after the July 2019 incident.  He did not make that claim to medical staff while in KDOC custody, nor did medical staff enter a diagnosis of seizures into his chart.  Rogers also failed to designate a medical expert to testify in support of his claim of ongoing health effects from the July 2019 incident, including his claim of ongoing seizures, alleged nerve damage, and PTSD.  Without an expert, Rogers has no evidence to support a damage claim for medical expenses and lost wages for the rest of his life.  For example, Rogers has failed to designate an expert who can testify that he suffers from such conditions, that the conditions are due to the July 2019 incident, and the expected duration/prognosis/treatment for these alleged conditions.  A layperson cannot opine on these subjects.  Similarly, Plaintiff cannot recover for medical expenses while in custody as there is no evidence that he has incurred any expense and he cannot claim the reasonable value of medical services without an expert.  Any claim for lost future earning capacity requires competent evidence suggesting that Plaintiff's injuries from the July 2019 incident have narrowed the range of economic opportunities available to him and caused a diminution in his ability to earn a living.

      ii.    Rogers is not entitled to punitive damages because English did not act with reckless or callous indifference to Rogers' federally protected rights, nor was his conduct motivated by evil motive or intent.

      iii.    Rogers' damage claim based on purported income from Impact Designs is barred because it was not included in Rogers' written discovery responses.  Also, these claims are unsupported for reasons including that he was not

        qualified for these jobs, never held these jobs, and has not been in KDOC custody since approximately September 2021.

   iv.    At all times relevant to this action, English acted in a manner that was proper, reasonable, lawful, and in the exercise of good faith.

   v.    Rogers' claimed damages were not caused by English, but rather by Rogers' own actions or inactions.

   vi.    English is entitled to qualified immunity.

   vii.    Attorneys' fees are limited by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(d), which limits any such award to fees directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under 42 U.S.C. § 1988 and in an amount that is proportionately related to the court-ordered relief for the violation and the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.  Furthermore, under the PLRA, no award of attorneys' fees shall be based upon an hourly rate greater than 150% of the hourly rate established under 18 U.S.C. § 3006A.  A portion of any monetary judgment (not to exceed 25%) shall be applied to satisfy the amount of attorney's fees awarded against the defendant.  Attorneys' fees are capped at 150% of the monetary judgment.

**5.     DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

Rogers seeks the following relief:[7]

   a.    Compensatory damages including the following:

        i.    Damages to compensate for lost wages to date, in an amount to be determined by the jury, of at least $53,670, calculated as follows:

- 2019 lost wages: $720 - Low Med Lvl 3 Aramark position, 6 months of lost wages

- 2020 lost wages: $17,650 - Impact Design position, which pays minimum wage, and which it was indicated Rogers would receive until his 2019 attack at which point it was given to someone else ($8.50/hr x 40 hr/wk x 52 weeks)

---

[7] English objects to most of Rogers' stated damage categories on the grounds that they were not properly disclosed in discovery and/or are not properly supported by evidence.  These objections are overruled.  This portion of the pretrial order requires Rogers to set forth his computation of damages, which he has done here.  English can lodge any objections he might have to the evidence concerning these damage categories at trial.

- 2021 lost wages: $17,650 - same calculations for lost Impact Design position

- 2022 lost wages: $17,650 – same calculations for lost Impact Design position

    ii. Damages to compensate for lost sense of security and individual dignity, in an amount to be determined by the jury.

    iii. Damages for medical expenses (including treatment and medication) and lost wages for the rest of Rogers' life due to ongoing seizures and PTSD, in an amount to be determined by the jury.

    iv. Damages for physical injury and pain and suffering, including back pain and nerve damage, in an amount to be determined by the jury.

b. Punitive damages, in an amount to be determined by the jury, of at least $200,000.

c. Attorneys' fees pursuant 42 U.S.C. § 1988.

**6.   AMENDMENTS TO PLEADINGS.**

None.

**7.   DISCOVERY.**

Under the scheduling order and any amendments, all discovery was to have been completed by April 28, 2022. Discovery is complete.

Unopposed discovery may continue after the deadline to complete discovery so long as it does not delay the briefing of or ruling on dispositive motions or other pretrial preparations. Although discovery may be conducted beyond the deadline for completion of discovery if all parties are in agreement to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

**8.   MOTIONS.**

    **a)   Pending Motions.**

None.

    **b)**    **Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

    i.    Rogers intends to file a motion for a spoliation instruction for the lack of a document retention policy under English's supervision, or of any litigation hold in this case, and for the destruction of both electronic and hard copies of various waiver forms referenced in 2019 documents and in testimony from current and ex-KDOC employees.  For instance, English testified that he was informed of a written waiver form that was issued, with the requirement that E1 inmates sign it or be punished for violating a verbal order, that was later "rescinded," and all copies of that document appear to have been destroyed.  The jury should be instructed to infer that these forms were destroyed because they would be harmful to English's positions in this lawsuit.  English also testified that he and his subordinates passed out a form telling inmates that the MMU was being disbanded and requesting that inmates come tell him whether they wanted to go into protective custody or general population.  English admits he likely deleted this document after creating it, and no paper copies have been produced, suggesting that if they ever existed they have all been destroyed.  Emails from around that time also reference an "E1 Memo," for which no copies have been produced, suggesting they have all been destroyed.

    ii.    Rogers may file a motion to conduct the trial via videoconference if his incarcerated status prevents him from being able to attend trial in person.

    iii.    Rogers intends to file a motion to exclude all evidence produced by English after the close of fact discovery on April 28, 2022, including the productions received after the pretrial conference on June 24, 2022.

    iv.    English intends to file a motion for a spoliation instruction against Rogers on two grounds.  First, Rogers has not produced the original of the June 5, 2019 Form 9.  The version of the form that Rogers submitted to the Court purports to contain a handwritten response in which English allegedly states that he was "aware of the situation and it will be dealt with."  Both Judge Marten and Judge Robinson relied upon the June 5, 2019 document as submitted by Rogers, including English's purported statement, to find that a genuine issue of material fact precluded dismissing the action based upon qualified immunity.  However, English testified that is not his handwriting on the document.  English requested that the original be produced and, to date, it has not been.  While Rogers suggests that the original may have gotten lost during the filing process, the Court's docket shows that the filing in question was e-filed, as per usual policy for inmate filings.  Rogers also has not produced a copy of the notices that were distributed to all the MMU inmates notifying them that the unit was closing.  Rogers was asked to

       produce all documents related to his claim in a request for production in August 2021 and again at his deposition.  The notices were not produced.

  v.    Rogers anticipates filing motions in limine—*e.g.*, to exclude references to Rogers' past convictions, alleged gang affiliations, and alleged disciplinary violation within KDOC that is improper character evidence.  Rogers also intends to file a motion to exclude an April 29, 2019 Protective Custody Form (ECF 21-6, at 1).

  vi.    English anticipates filing motions in limine—*e.g.*, a motion to exclude references to events prior to English's supervision of Rogers in the MMU, including events that occurred in 2017.  References to events occurring prior to English's supervision and general references to what "all KDOC employees" allegedly knew are irrelevant to English's knowledge on June 25, 2019, and excludable under FED. R. EVID. 403.

  vii.    English anticipates filing a motion pursuant to FED. R. CIV. P. 37(c) prohibiting Rogers from using information not disclosed in discovery or through timely Rule 26(e) supplementation.

  viii.    English anticipates filing a motion for judicial estoppel to prohibit Rogers from deviating from the factual basis he previously asserted and the court's grounds for denying qualified immunity.

Consistent with the scheduling order filed earlier in this case, the arguments and authorities section of briefs or memoranda must not exceed 30 pages, absent an order of the court.

    **c)**    **Motions Regarding Expert Testimony.**  All motions to exclude testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, must be filed no later than 42 days before trial.

**9.**    **TRIAL.**

At the direction of the district judge presiding over trial, the trial docket setting is amended to **December 13, 2022, at 9:00 a.m., in Kansas City, Kansas.**  This case will be tried by jury.  Trial is expected to take approximately three (3) days.  The trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial,

motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

**10.    ALTERNATIVE DISPUTE RESOLUTION (ADR).**

The parties believe the prospects for settlement of this case are poor and they do not believe that further court-ordered ADR would be helpful.

The parties are reminded that they must immediately notify the court if they reach an agreement that resolves the litigation as to any or all parties.  *See* D. KAN. RULE 40.3.  Jury costs may be assessed under this rule if the parties do not provide notice of settlement to the court's jury coordinator at least one full business day before the scheduled trial date.

IT IS SO ORDERED.

Dated July 15, 2022, at Kansas City, Kansas.

                          s/ Angel D. Mitchell
                          Angel D. Mitchell
                          U.S. Magistrate Judge